**STATE of Missouri, Respondent,**

v.

**Herman MAYFIELD, Appellant.**

**No. WD 47789.**

Missouri Court of Appeals,
Western District.

April 12, 1994.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 31, 1994.

Application to Transfer Denied
Aug. 15, 1994.

Charles A. Powell, Jr., Macon, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., F. Martin Dajani, Asst. Atty. Gen., Jefferson City, for respondent.

Before ULRICH, P.J., and
BRECKENRIDGE and ELLIS, JJ.

ULRICH, Presiding Judge.

Herman Mayfield appeals his conviction of receiving stolen property—by disposing of stolen property valued in excess of $150.00, in violation of § 570.080, RSMo 1986. Mr. Mayfield waived his right to a jury trial. Mr. Mayfield contends that the evidence presented was insufficient to support the conviction.

Pat and Judy Broughton own a hog production farm in Shelby County. On May 7, 1991 the Broughtons noticed that some of their hogs were missing from their confinement building.[1] They estimated that twenty to twenty-five hogs weighing from ninety to one hundred and thirty pounds were missing. They reported to the Sheriff's department that the hogs had been stolen. They estimated that the hogs were stolen on May 5, 1991, because rain had fallen before that day, and they had noticed fresh tire tracks leading to the confinement building on May 6, 1991. Deputy Oliver of the Shelby County Sheriff's department photographed the tracks and determined that the tracks were of a truck pulling a trailer. The tracks did not match any of the vehicles or trailers owned by the Broughtons. The Broughtons told Deputy Oliver that the missing hogs were a mixed breed, and their coloration was white, black, red and some spotted. This mixed breed is called "Farmers Hybrid." Farmers Hybrid are normally short-legged with smaller heads and snouts but with longer bodies. A few of the gilts [2] had ear markings. The ear marking or notching had been done in a random manner. Farmers commonly notch the ears of gilts they intend to retain for breeding purposes. The tails were "docked" in a circle or "6" shape. Docking tails is a common practice of hog farmers. The hogs had been confined inside a building on a concrete floor. The Broughtons testified that hogs kept indoors would have shorter hair and would sunburn if placed out in the sun for a length of time. Hogs kept on concrete would also develop callouses on their legs.

Deputy Oliver called some livestock auction barns and discovered that on May 7, 1991, 18 hogs had been sold in Macon County under the name Brenda Patterson. Eleven of these hogs sold on May 7, 1991 weighed an average of 110 pounds. Six hogs weighed an average of 147 pounds and one was a crippled 70 pound "runt." The Broughtons and Deputy Oliver went to the farm where the eleven hogs were sold. The buyer had placed the eleven hogs with six to nine other hogs. The Broughtons identified the eleven, saying that they "looked like ours." They were of the same basic coloration and appeared to be sunburned. The purchaser had poured oil on their backs because of the redness of their skin. At another farm, the Broughtons identified six of the hogs purchased from the auction barn as appearing to be theirs. They were of the same basic coloration, appeared sunburned and were standing together. Of these 17 hogs, some of the gilts had random ear notching and all but three had tails docked in a "6" shape.

An investigation of Brenda Patterson, who as a co-defendant in this case was found not guilty, revealed that Mr. Mayfield had sold hogs in Ms. Patterson's name on various occasions, and each time Mr. Mayfield gave her the check to cash for him. She gave him the money. Mr. Mayfield owed money to a feed store and it had a lien on his hogs. By selling hogs in Ms. Patterson's name, Mr. Mayfield prevented the check's proceeds being applied directly to his account with the feed store. This procedure was used by Mr. Mayfield on this occasion.

Mr. Mayfield told Deputy Oliver in his first statement that the hogs he sold had been sick and had been kept in a shed until shortly before he sold them. Mr. Mayfield's statement was entered into evidence by the state. Mr. Mayfield claimed both in his statement and in his testimony at trial that all the hogs he sold were his. His sows had farrowed [3] them, and they had been at his hog farm until the day he took the 18 in the back of his pickup truck to sell. He never disputed that the 18 hogs were sold by him. Mr. Mayfield

---

1. The Broughtons kept approximately 125 hogs in that confinement building. They also had other buildings housing other hogs.

2. A gilt is a young female swine.

3. Gave birth.

claimed that he docked his hogs tails in a "6" shape and had notched the ears of some of the gilts he had originally planned to keep. He said he later decided to sell some of the gilts he had notched.

Deputy Oliver found no other evidence to connect Mr. Mayfield to the theft or the receiving of the Broughtons' hogs. Mr. Mayfield did not own a trailer and the tracks photographed at the Broughtons' farm did not match the tracks of Mr. Mayfield's truck. Witnesses testified that Mr. Mayfield had a large number of hogs during March and April and in early May did not have that same number remaining. Evidence was presented that Mr. Mayfield regularly purchased a large amount of "pig feed" during the months preceding May 7, 1991. The state did not present evidence as to how many hogs the amount of feed purchased would support. The state did not present any evidence to explain the location of the hogs Mr. Mayfield purportedly had during March and April.

An expert testified that photos of the 17 hogs[4] appeared to have characteristics typical of Farmer's Hybrid hogs. Photos were taken in June of some of Mr. Mayfield's sows. Mr. Mayfield claimed those photographed were not the sows that farrowed the hogs he sold.[5] The expert did not view any of the hogs except by photograph. He gave his opinion, based on the photographs, that the hogs in question did not appear to be offspring of the photographed sows.

### Sufficiency of the Evidence

Mr. Mayfield contests the sufficiency of the evidence to support his conviction. When sufficiency of evidence is at issue, appellate courts do not weigh the evidence but accept as true all evidence tending to prove guilt together with all inferences that support the verdict and ignore all contrary evidence and inferences. *State v. Sladek*, 835

S.W.2d 308, 310 (Mo. banc 1992); *State v. Dulany*, 781 S.W.2d 52, 55 (Mo. banc 1989). In determining whether sufficient evidence has been presented to support a conviction based on circumstantial evidence, appellate review is limited to determining whether sufficient evidence has been presented for a reasonable juror to find the defendant guilty beyond a reasonable doubt. *State v. Grim*, 854 S.W.2d 403, 406 (Mo. banc 1993), *cert. denied*, ⸺ U.S. ⸺, 114 S.Ct. 562, 126 L.Ed.2d 462 (1993). When the case is tried without a jury the same standard of review is used. *Sladek*, 835 S.W.2d at 310.

"The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits the conviction of any defendant 'except upon evidence that is sufficient fairly to support a conclusion that *every element* of the crime has been established *beyond a reasonable doubt.*'" *Grim*, 854 S.W.2d at 417 (Robertson, C.J., dissenting) (quoting *Jackson v. Virginia*, 443 U.S. 307, 314–15, 99 S.Ct. 2781, 2786–87, 61 L.Ed.2d 560 (1979)) (emphasis added by Robertson). "[T]he reasonable doubt standard is indispensable to command the respect and confidence of the community.... It is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned." *Id.* (quoting *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072–73, 25 L.Ed.2d 368 (1970)). "The constitutional protections embodied in the presumption of innocence and the requirement of proof beyond a reasonable doubt are not reserved simply for the morally blameless, nor are they reserved for use only in 'easy' cases." *Grim*, 854 S.W.2d at 417 (Robertson, C.J., dissenting).

Every appellate court addressing an attack on the submissibility of a criminal case bears the responsibility of deciding whether the State has presented sufficient evidence from which the jury can find all of

4. No further mention is made in the record of the runt. The record is unclear whether the Broughtons claimed the runt was theirs.

5. Mr. Mayfield claims to have sold two of the three sows that farrowed the hogs he sold. The state did not present evidence that Mr. Mayfield had not sold the sows. The prosecutor claimed

in his questioning of Mr. Mayfield that the sale barn where Mr. Mayfield claimed to have sold his sows did not have records of the sale. However this statement by the prosecutor was not presented as evidence that could be considered by the court.

the elements of the crime on the basis of the facts presented, not speculation or emotion. This appellate responsibility is not one of weighing the evidence anew as a jury, but of making sure that the jury's deliberations comport with due process.

*Id.* at 425.

The statute making receiving stolen property a crime states:

1. A person commits the crime of receiving stolen property if for the purpose of depriving the owner of a lawful interest therein, he receives, retains or disposes of property of another knowing that it has been stolen, or believing that it has been stolen.

2. Evidence of the following is admissible in any criminal prosecution under this section to prove the requisite knowledge or belief of the alleged receiver:

(1) That he was found in possession or control of other property stolen on separate occasions from two or more persons;

(2) That he received other stolen property in another transaction within the year preceding the transaction charged;

(3) That he acquired the stolen property for a consideration which he knew was far below its reasonable value.

3. Receiving stolen property is a class A misdemeanor unless the property involved has a value of one hundred fifty dollars or more, or the person receiving the property is a dealer in goods of the type in question, in which cases receiving stolen property is a class C felony.

§ 570.080, RSMo (1986). To be guilty of the felony of receiving stolen property by disposing of it, one must be proven beyond a reasonable doubt to have, on or about a date certain, in a Missouri county, disposed of another person's property, having a value of at least one-hundred and fifty dollars, in a way that made recovery by the owner unlike-ly, knowing at that time that the property had been stolen. MAI–CR 3d 324.10 [1987].

The state was compelled to prove beyond a reasonable doubt that the hogs sold by Mr. Mayfield were another person's stolen property with a value exceeding one hundred and fifty dollars. The state, therefore, attempted to prove that the hogs sold by Mr. Mayfield were the same hogs stolen from Mr. and Mrs. Broughton. The state also was compelled to prove that Mr. Mayfield knew or believed the hogs he sold were stolen. Mr. Mayfield was not charged with defrauding his creditor, and his wrongful actions toward his creditor do not prove his guilt in this case.[6]

The state's evidence was circumstantial. The hogs were sold by Mr. Mayfield within a few days after the Broughtons' hogs were stolen, and they were of the same basic coloration, size, and appearance. The victims of the theft thought the hogs sold by Mr. Mayfield "just looked like our hogs." The hogs' sunburn was the major factor in the identification and, along with Mr. Mayfield selling the pigs under Ms. Patterson's name, was perhaps the strongest circumstantial evidence of guilt. The state's evidence supports either the theory that Mr. Mayfield sold hogs that were similar in size, coloration and shape to the Broughtons' and that his hogs were sunburned, as they would have been if kept in a shed due to sickness before exposure to sunlight, or the theory that somehow Mr. Mayfield received and then sold the Broughtons' stolen hogs.

Missouri's circumstantial evidence rule[7] was rejected by the Missouri Supreme Court in *State v. Grim,* 854 S.W.2d 403, 405 (Mo. banc 1993). If this case were reviewed under the circumstantial evidence rule, a reversal and discharge would be proper. The

---

**6.** Mr. Mayfield claims that his race, combined with his wrongful acts of circumventing a valid lien, were major factors in determining his guilt. Nothing in the record indicates that the trial court was racially prejudiced.

**7.** The circumstantial evidence rule required that when the conviction rested on circumstantial evidence, the facts and circumstances to establish guilt must have been consistent with each other, consistent with the guilt of the defendant, and inconsistent with any reasonable theory of innocence. In such cases the evidence did not need to be absolutely conclusive of guilt, nor did it need to demonstrate the impossibility of innocence. *State v. Livingston,* 801 S.W.2d 344, 347 (Mo. banc 1990).

*Grim/Dulany* [8] standard does not eliminate the *State v. Roberts,* 709 S.W.2d 857, 862 (Mo. banc 1986), *cert. denied,* 479 U.S. 946, 107 S.Ct. 427, 93 L.Ed.2d 378 (1986), and *State v. Black,* 611 S.W.2d 236, 240 (Mo.App. 1980), rule that where two equally valid inferences can be drawn from the same evidence, that evidence does not establish guilt beyond a reasonable doubt.

"Our society long ago rested its faith in a system that declares it far better to let a guilty person go free than to imprison an innocent one. It is this commitment to the rule of law that separates us from the barbarians." *Grim,* 854 S.W.2d at 425 (Robertson, C.J., dissenting). Although one may speculate that the circumstances indicated more probably than not, that these hogs were the property of the Broughtons, the evidence presented was insufficient to establish, beyond a reasonable doubt, the Broughtons' ownership, and, therefore, failed to prove Mr. Mayfield's guilt.

Mr. Mayfield's point is granted. The conviction is reversed, and Mr. Mayfield is ordered discharged.

All concur.

---

8. *State v. Dulany,* 781 S.W.2d 52 (Mo. banc 1989).