STATE of Missouri, Respondent,

v.

Mohammed (Michael) ALUL, Appellant.

Mohammed (Michael) ALUL, Appellant,

v.

STATE of Missouri, Respondent.

No. 68380.

Missouri Court of Appeals,
Eastern District,
Division Two.

June 27, 1997.

**216**

Arthur S. Margulis, David R. Crosby, Margulis & Grant, P.C., St. Louis, for appellant.

Jeremiah W. (Jay) Nixon, Becky Owenson Kilpatrick, Office of the Attorney General, Jefferson City, for respondent.

GERALD M. SMITH, Judge.

Defendant appeals from his conviction of the class B felony of sodomy in violation of section 566.060, RSMo 1986. He also appeals from denial of his post-conviction motion pursuant to Rule 29.15. We reverse the conviction and dismiss the 29.15 appeal.

We review the evidence in the light most favorable to the verdict. On August 28, 1986, J.C., eleven years old went to defendant, her family's regular physician, for a routine physical examination so she could participate in volleyball during the upcoming school year. J.C.'s mother dropped her off at the doctor's office but did not accompany her to the examination because she had an errand.

Defendant performed a routine physical examination including examination of J.C.'s eyes, ears, nose and throat, and listening to her heart. Defendant inquired if J.C. had begun menstruating and she answered affirmatively. Defendant then requested that she pull down her shorts and underwear and lie on the examination table. She did. Defendant then placed his left hand on her lower abdomen and inserted something into J.C.'s vagina. J.C. could not see her vaginal area but believed that what was inserted was defendant's finger or fingers. Defendant did not wear gloves during the examination, and did not use instruments to perform the examination. No nurse or attendant was present during the examination, and the door was closed. Defendant moved his finger or fingers inside J.C.'s vagina during the examination. During the examination defendant asked J.C. "How does this feel?", and she replied that it hurt. During the examination defendant did not touch himself and was not breathing heavily. J.C. testified that the vaginal examination lasted "a long time" but that description was never quantified. Following the examination, defendant told J.C. to get dressed, washed his hands and left the examining room. When J.C.'s mother picked her up after the examination J.C. was upset and crying, but did not want to talk about why. She did state that she hated defendant and did not want to go back to him again. Nearly seven years after the examination J.C. was watching television and saw defendant on the evening news. She became pale and told her mother of the examination in defendant's office seven years previously. Her parents called the police and this prosecution resulted.

The state utilized a board certified pediatrician who was a sexual abuse forensics examination network physician as an expert witness. She testified that it was not uncommon for children to delay in reporting sexual abuse for reasons of shame or embarrassment. She testified that it was unusual to do an internal examination of the genitals of an eleven year old girl without any indication that the child is sexually active or there is a particular complaint or medical problem that required such an examination. She said it was improper to give an internal pelvic examination without obtaining the permission of the patient or the parent, that such an examination should not be given without a third person in the room, and that proper protocol called for utilization of gloves during the examination. She could find no documentation in J.C.'s chart that a pelvic examination had been made and testified that such

documentation should have been made. She also testified that the proper question to ask during such an examination is "Does this hurt?" rather than the question posed by the defendant.

She admitted she could not read defendant's handwriting and acknowledged that other portions of the physical examination were also not on the chart and that the physician may not have been a "detailed charting person". She testified that the reason for having a third person in the room was to protect the examiner as well as to make the patient comfortable. She admitted that some doctors were more scrupulous about using gloves than others, and that while the proper protocol in 1986 called for wearing gloves, the AIDS epidemic has made that protocol more mandatory at the present time.

The expert was asked to describe the method of performance of an internal pelvic examination. She stated it was performed by palpating with one hand on the lower abdomen and two fingers internally, moving the fingers inside the vaginal vault to feel all surfaces to locate masses.[1]

Defendant has raised eight points on appeal. Because the first point, the sufficiency of the evidence to support the conviction, is dispositive we need address only that point.

The standard for appellate review of the sufficiency of the evidence to support a criminal conviction was stated in *State v. Dulany*, 781 S.W.2d 52 (Mo.banc 1989)[2,3]:

> On review, the Court accepts as true all of the evidence favorable to the state, including all favorable inferences drawn from the evidence and disregards all evidence and inferences to the contrary.... In reviewing a challenge to the sufficiency of the evidence, appellate review is limited to a determination of whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt.

The *Dulany* standard echoes the due process standard announced by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). *State v. Grim*, 854 S.W.2d 403 (Mo.banc 1993)[1]. To withstand scrutiny under the *Dulany* standard, i.e., the due process minimum, a conviction must be supported by enough evidence that a juror, taking all evidence in the light most favorable to the State, would be convinced beyond a reasonable doubt. *Id.* at [2]. In such review we grant the state all reasonable inferences from the evidence and disregard contrary inferences, *unless they are such a natural and logical extension of the evidence that a reasonable juror would be unable to disregard them. Id.* at [4,5]. (Emphasis supplied).

██ Where the evidence presents two equally valid inferences, one of defendant's guilt and the other of his innocence, it does not as a matter of law, establish guilt beyond a reasonable doubt. *State v. Dooley*, 919 S.W.2d 539 (Mo.App.1995)[1–3]; *State v. Mayfield*, 879 S.W.2d 561 (Mo.App.1994)[1–3]; *State v. Black*, 611 S.W.2d 236 (Mo.App. 1980)[9]. In such a case, the trial court lacks the power to convict and the appellate court must reverse. *Dooley, supra; State v. Gardner*, 737 S.W.2d 519 (Mo.App.1987)[3].

The state contends that the "two inference" rule was abolished by *State v. Grim, supra*. That case dealt with the circumstantial evidence rule, which basically held that where circumstantial evidence was required in whole or in part to support a conviction a higher standard of proof was required than in a direct evidence case. The case does not deal specifically with the "two inference" rule.

However, the majority in *Grim* criticized the dissent's invocation of the two inference rule. *Id.* at [7]. It found two fallacies with the dissent's invocation of the rule. *Id.* First, it found the two inferences in the case before it were not equally valid. *Id.* Having found that, the court need not have gone

---

1. Defendant produced an expert witness who was a pediatrician and teacher of pediatric-cardiology at St. Louis University. He refuted much of the testimony of the state's expert including the medical discretion to perform internal pelvic examinations of girls around the time of their first menses. Because we review the evidence in the light most favorable to the state we do not consider and therefore need not set forth the testimony of that witness.

further. However, *in dicta*, it stated that the dissent ignored the requirement that "the Court accept[ ] as true all the evidence favorable to the state, including all favorable inferences drawn from the evidence". *Id.* From this the majority concluded that "[i]f an appellate court sets itself up to select between two or more acceptable inferences, it ceases to function as a court and functions rather as a juror, actually a 'super juror' with veto powers." It concluded that "[i]t is not the function of the court to decide the disputed facts; it is rather the court's function to assure that the jury, in finding the facts, does not do so based on sheer speculation".

An inference is defined as:

"A truth or proposition drawn from another which is supposed or admitted to be true. A process of reasoning by which a fact or proposition sought to be established is deduced as a logical consequence from other facts, or a state of facts, already proved or admitted. A logical and reasonable conclusion of a fact not presented by direct evidence but which, by process of logic and reason, a trier of fact may conclude exists from the established facts."

Black's Law Dictionary, Sixth Edition; *State v. Hyde*, 682 S.W.2d 103 (Mo.App.1984)[8,9].

■ The thrust of the "two inference" rule is that if by application of logic and reason to the facts most favorable to the prosecution two equally logical inferences can be drawn then the jury is not free to choose the inference indicating guilt and ignore the inference indicating innocence. If two equally logical inferences point one to innocence and one to guilt then a juror could not find guilt beyond a reasonable doubt without sheer speculation. A reasonable juror would be unable to disregard the inference pointing to innocence.

■ When an appellate court invokes the two inference rule it is not selecting one or the other of two equally logical inferences but recognizing that a defendant's guilt based upon jury selection of the guilty inference while ignoring the innocent inference is not guilt beyond a reasonable doubt. In *Grim, supra*, the court found the inferences were not equally logical and the rule did not

apply. We do not view *Grim* as going beyond that.

The Western district of this court in *Mayfield, supra*, reached the same conclusion, as did we in *State v. Dooley, supra*. *Dooley* was transferred to the Supreme Court by that court and then retransferred to this court. Transfer in *Mayfield* was denied by the Supreme Court. We believe these actions of the Supreme Court support a conclusion that the two inference rule was not abolished by *Grim*. *See also State v. Hodge*, 927 S.W.2d 500 (Mo.App.1996)[4]; *State v. Idlebird*, 896 S.W.2d 656 (Mo.App.1995)[5].

■ The statute under which defendant was prosecuted was Section 566.060 RSMo 1986 which provides: "3. A person commits the crime of sodomy if he has deviate sexual intercourse with another person to whom he is not married who is less than fourteen years old." "Deviate sexual intercourse" was defined as "any sexual act involving the genitals of one person and the mouth, tongue, hand or anus of another person." Section 566.010 RSMo 1986. The crime requires by implication an intent to arouse or gratify sexual desire because to hold otherwise "would be to criminalize innocent contacts and touchings (such as doctor's physical examinations or perhaps quarterbacks awaiting the snap of the football)." *State v. Fields*, 739 S.W.2d 700 (Mo.banc 1987)[4]; *State v. Harnar*, 833 S.W.2d 25 (Mo.App.1992)[2,3]. Direct proof of a required mental state is seldom available, and such intent is usually inferred from circumstantial evidence. *State v. Martin*, 882 S.W.2d 768 (Mo.App.1994) l.c. 770.

■ There is no dispute in this case that defendant inserted his fingers into the vagina of J.C. The only issue to be determined by the jury was whether he did so to arouse or gratify sexual desire. The evidence would support either of two inferences. One, that the defendant intended to gratify his sexual desire. Two, that he entered J.C.'s body as part of a medical examination without an intention to gratify his sexual desire. The testimony of J.C. did not indicate any lascivious speech or actions by the defendant. No effort was made to quantify the time the vaginal examination took and no evidence

was adduced that the time was other than what would be expected in a routine vaginal examination. The testimony of the state's expert witness indicated that the doctor did not follow a number of usual protocols for such an examination, and that the expert witness did not consider the examination necessary.

From the expert's testimony it may be concluded that the defendant conducted an arguably unnecessary examination in an unprofessional and insensitive manner. The actual examination was performed in the manner described by the expert as the correct use of one hand and the fingers of the other hand. It may be a reasonable inference without more that an unnecessary and unprofessional genital examination evidences an intent to gratify sexual desire. It is at least an equally reasonable inference that such an examination by a physician during a physical examination evidences insensitivity, carelessness, unprofessionalism, and negligence but not an intent to gratify sexual desires. Under the facts here the evidence was not sufficient to establish defendant's guilt beyond a reasonable doubt.

CRANE, P.J., and PUDLOWSKI, J., concur.

