STATE of Missouri, Plaintiff–Respondent,

v.

Albert HUDSON, Defendant–Appellant,

and

Albert HUDSON, Movant–Appellant,

v.

STATE of Missouri, Respondent.

Nos. 20024, 21851.

Missouri Court of Appeals, Southern District, Division Two.

May 27, 1998.

Rosalynn Koch, Asst. Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Catherine Chatman, Asst. Atty. Gen., for respondent.

PARRISH, Presiding Judge.

Albert Hudson (defendant) was convicted, following a jury trial, of burglary in the first degree, § 569.160, RSMo 1986, and attempt to commit forcible rape, § 566.030.[1] Defendant was charged and sentenced as a prior offender. *See* § 558.016.1 and .2.

Defendant thereafter filed a pro se motion for post-conviction relief as permitted by Rule 29.15. Counsel was appointed and an amended motion filed. The motion was denied after an evidentiary hearing.

Defendant appeals the judgment of conviction in his criminal case, No. 20024, and the judgment denying his Rule 29.15 motion, No. 21851. The appeals were consolidated in accordance with Rule 29.15(*l*) as that rule existed at the time defendant's pro se motion was filed. See Rule 29.15(m).

Defendant presents four points on appeal. Points I, II and III are directed to his appeal of the judgment of conviction in his criminal case. Point IV is directed to the appeal of the judgment denying his Rule 29.15 motion.

---

1. References to statutes are to RSMo 1993 unless stated otherwise.

*No. 20024*

On February 9, 1994, at about 10:00 p.m. Linda Mays was in her apartment at Sikeston, Missouri. She was taking a bath when she heard a noise that sounded like her front door was being kicked. She got out of the bathtub and opened her bathroom door to look out. She saw a black man wearing a dark sweatshirt with a hood. The hood was pulled close about his face with a drawstring. He was about a foot from the bathroom door. She was unclothed. He grabbed her. She explained:

> Well, I'm not sure what happened between the time that I made eye contact with him to the next thing I remember being back in the tub, and being in the tub, and sitting in the wrong direction, with my back to the faucet, and him coming towards me and then grabbing me.

She described what happened next:

> He put both hands around my neck and started choking me, and pushing me down into the water. I thought he was going to drown me in that tub basically, and then he took his left hand and stuck his finger inside me, and then I threw up my hands and pretty much said, "Okay, I give up."

The intruder took Ms. Mays, fighting, into the bedroom. He was behind her with his arms around her. She estimated they struggled for ten or fifteen minutes. She described her struggle:

> Well, I was on my back. He was on top of me, straddled. I was trying to reach a bat that was on the floor behind me. We were on a mattress, not a bed. My son and I didn't have a whole lot of things. That was where he slept, on a mattress, so I was close enough to the ground that my son kept a bat in there, and I did finally get my hands around the bat, and when he saw me, he lunged at me and pushed it out of my hands, and I tried to reach the stereo knob so I could turn it up real loud and maybe someone would hear. I don't know what he was doing, but he got aggravated at me and hit me in my jaw and ear.

Ms. Mays bit defendant's finger during the struggle and "kept telling him that [her] son would be home any minute and that he would kill him." Defendant finally ran from the apartment. Ms. Mays grabbed a bedspread to cover herself and ran after him. She was screaming. She ran into the street and fell. Neighbors came out of their houses. The police arrived a short time later. Ms. Mays went to the police station. She described her attacker as about five feet ten inches tall and heavy with a "kind of round head."

Police found boot prints in the snow surrounding the building where Ms. Mays' apartment is located. They found a blue Notre Dame sock cap in the apartment that did not belong to Ms. Mays or her son.

Bob Davis is an employee of the City of Sikeston Fire Division. His residence is on Center Street, one block away from the street where Ms. Mays' apartment was located. On the evening of her attack Mr. Davis had guests. He came out of his residence onto his front porch as his guests were leaving. He saw someone coming toward his residence on Center Street wearing dark clothing. The person was coming west on Center Street. He took off running. Mr. Davis did not pay much attention to the person on the street. He explained, "I didn't think anything of it because it was cold out there."

Mr. Davis went back inside his residence where he heard a radio dispatch on a scanner located in his house. The dispatch reported that a woman had been sexually assaulted in the 200 block of a street next to the one where he lived. Mr. Davis reported what he had seen to the police.

Officer Hank Trout of the Sikeston Department of Public Safety was sent to Mr. Davis' residence. Mr. Davis took Officer Trout to the location where Mr. Davis had observed someone running. They found tracks that led to the front door of a house some distance from where they started.

Officer Trout testified that there was fresh snow; that the tracks were in the snow. The tracks looked to Officer Trout as if they had been made by a man's work boot. He estimated the size of the boot as 10 to 11. The print had a diamond shape on it. He explained it was eleven o'clock at night; that most of the places where they observed the

tracks "were yards where nobody else had walked." A plaster cast and photographs were made of the boot print. There were no other tracks in the area.

The location to which the tracks led was a house at 603 Montgomery Street. Officer Copeland accompanied Officer Trout to the location. Two other officers, Lt. Armour and Officer Wyatt, joined them.

Lt. Armour knocked on the door to the residence. A black male, Percy Baker, answered the door. A woman, Josephine Hudson, was asleep on a couch. She woke up. Ms. Hudson told the officers the house was her residence.

The officers were given permission to search the premises. Officer Trout went with Ms. Hudson to a bedroom. The light in the room was on and the door was open. Officer Trout saw someone lying on a bed. As Ms. Hudson started to close the door, he asked who was in the room. She replied, "Albert." Officer Trout opened the door and called for Lt. Armour and the others.

The person in the bedroom was defendant. Officer Trout saw a pair of boots on the floor at the foot of the bed. One boot was on its side. The sole appeared to have the same design as the tracks in the snow the officers had followed. Officer Trout seized the boots.

There was a sweatshirt on the floor next to a closet. It was hooded with pull strings and had pockets. It was a dark color. Officer Wyatt picked it up. Ms. Hudson told the officers, "The search is over, terminated." She told them she wanted them out of the house. Lt. Armour instructed Officer Wyatt to put the sweatshirt down. He told the officers to leave the house.

Officer Trout returned to Ms. Mays' residence. Tracks were found that appeared to match those Officer Trout had followed from the area near Mr. Davis' residence.

A search warrant was obtained for the house at 603 Montgomery Street. The officers returned there with it. At first, no one answered the door. Lt. Armour was prepared to force the door open. He kicked it. A voice inside told him to wait. The door opened.

Following a search, items were seized, including a sweatshirt that appeared to be the same one the officers had seen when they were at the house earlier. Defendant was arrested.

At trial a firearms and tool marks examiner and forensic scientist from Southeast Missouri Regional Crime Laboratory testified that the plaster cast taken of boot prints in the snow outside Ms. Mays' residence matched the tread of the boots the police seized in the room where defendant was first found at 603 Montgomery Street. He also testified that the sock cap found in Ms. Mays' residence contained a hair that microscopic examination revealed was consistent with hair samples given by defendant.

Defendant's first point on appeal asserts the trial court erred in denying defendant's motion for judgment of acquittal and in entering judgment of conviction in accordance with the jury verdict. Defendant argues that the state's evidence was not sufficient to establish defendant's guilt. He contends the evidence did not identify him as the person who entered Ms. Mays' apartment.

In considering claims of insufficiency of the evidence in criminal cases, appellate review is limited to determining if the evidence was sufficient for a reasonable juror to have found the person charged with the crime guilty beyond a reasonable doubt. *State v. Grim*, 854 S.W.2d 403, 405 (Mo. banc), *cert. denied*, 510 U.S. 997, 114 S.Ct. 562, 126 L.Ed.2d 462 (1993). This court accepts as true all evidence favorable to the state, including favorable inferences drawn from the evidence and disregards evidence and inferences to the contrary. *State v. Dulany*, 781 S.W.2d 52, 55 (Mo. banc 1989).

Defendant's argument is based on the evidence that there were two black males, he and Percy Baker, at the house where they found the boots that matched the footprints they had followed; that the evidence permitted "equally valid inferences" to be drawn, *viz.*, that the culprit was defendant or that it was Percy Baker. He contends, as a matter of law, that these circumstances preclude his being convicted.

Defendant's argument is two-fold. It is based on a principle denoted as the "equally valid inference rule" and on the claim that, regardless of the applicability of the equally valid inference rule, the evidence adduced did not prove defendant's guilt beyond a reasonable doubt; that it was met with equally strong exculpatory evidence.

■ The equally valid inference rule provided:

> Where the evidence presents two equally valid inferences, one of defendant's guilt and the other of his innocence, it does not as a matter of law, establish guilt beyond a reasonable doubt. *State v. Dooley,* 919 S.W.2d 539 (Mo.App.1995)[1–3]; *State v. Mayfield,* 879 S.W.2d 561 (Mo.App. 1994)[1–3]; *State v. Black,* 611 S.W.2d 236 (Mo.App.1980)[9]. In such a case, the trial court lacks the power to convict and the appellate court must reverse. *Dooley, supra; State v. Gardner,* 737 S.W.2d 519 (Mo.App.1987)[3].

*State v. Alul,* 948 S.W.2d 215, 217 (Mo.App. 1997). However, that rule is no longer applied in Missouri. *State v. Chaney,* 967 S.W.2d 47, 55–56 (Mo. banc 1998).

■ The remaining argument also fails. The intruder was a black male wearing a dark sweatshirt like the one observed on the floor near the bed where defendant was sleeping. A sweatshirt that appeared to be the same one police officers saw on the floor was later recovered from a washing machine upon execution of a search warrant.

A hair sample from a sock cap found in Ms. Mays' apartment was compared microscopically with a hair sample from defendant. The sock cap did not belong to Ms. Mays or her son. The microscopic examination of the hair sample showed it to be consistent with the hair sample from defendant.

Defendant testified at trial. He was asked about the sock cap that was found at Ms. Mays' apartment. He said he hadn't worn a cap the day of the assault, but told the jury the cap had been at his house.

The soles of the boots found by the bed where defendant was sleeping were damp. They matched the tracks in the snow the police officers followed to 603 Montgomery Street. They also matched the tracks that were outside the building in which Ms. Mays' apartment was located.

The evidence was sufficient for reasonable jurors to have found that defendant was the person who attacked Ms. Mays in her apartment. Point I is denied.

Defendant's second point is directed to the testimony of Andy Wagoner, a firearms and tool marks examiner and forensic scientist employed by Southeast Missouri Regional Crime Laboratory. Defendant contends the trial court erred in permitting Mr. Wagoner to testify that defendant's hair and hair found in the sock cap were similar, and in permitting him to state a statistical probability concerning another having the same hair type as defendant's.

Defendant did not object at trial to the testimony of Mr. Wagoner about which he now complains. "Absent objections to evidence at trial, assertions that it was inadmissible are not preserved for appellate review." *State v. Henderson,* 954 S.W.2d 581, 583 (Mo.App.1997).

Defendant apparently recognizes this failing in that Point II alleges the trial court "plainly erred" in permitting the testimony he now questions. Appellate courts have the discretion to consider errors affecting substantial rights upon finding that manifest injustice or miscarriage of justice resulted therefrom, notwithstanding that the errors were not otherwise preserved. Rule 30.20. *State v. Williamson,* 836 S.W.2d 70, 72 (Mo. App.1992). Defendant, however, bears the burden of demonstrating that manifest injustice or a miscarriage of justice will occur if the error asserted is left uncorrected. *Henderson, supra,* at 583–84.

Defendant argues that Mr. Wagoner's testimony involved application of scientific principles for purposes of determining the source of the hair sample taken from the sock cap that was found in Ms. Mays' apartment. He says the testimony was inadmissible because the procedures used by Mr. Wagoner, and on which his testimony was based, were not shown as having gained general acceptance in the particular field in which it belonged as required by *Frye v. U.S.,* 293 F. 1013, 1014

(D.C.Cir.1923), and *State v. Davis,* 814 S.W.2d 593, 600 (Mo. banc 1991), *cert. denied,* 502 U.S. 1047, 112 S.Ct. 911, 116 L.Ed.2d 812 (1992).

■ Defendant's argument is that the foundation on which Mr. Wagoner based his opinion was not sufficient to permit his testimony. As the state asserts in its brief, this is not a subject for plain error review. In *State v. Blue,* 875 S.W.2d 632, 633 (Mo.App. 1994), the Eastern District of this court held claims of inadequate foundation would not be considered for the first time on appeal. It quoted from *State v. Jones,* 569 S.W.2d 15 (Mo.App.1978):

> It is particularly important that where an inadequate foundation has been laid for admission of evidence that the objection made be specific as such foundation deficiencies can frequently be remedied. We will not review the contention of inadequate foundation raised for the first time on appeal.

*Jones,* 569 S.W.2d at 16.

We agree with the Eastern District. Defendant's request in Point II for plain error review is denied.

Point III is also a request for plain error review. It is directed to an allegation of instructional error. No objection was made at trial to the instruction about which defendant now complains. Neither was the issue raised in defendant's motion for new trial.

The instruction Point III alleges was erroneous is Instruction No. 7, the state's verdict-directing instruction for the offense of attempt to commit rape. The instruction is patterned after MAI–CR 3d 304.06 (1–1–87).[2] It states:

> As to Count II, if you find and believe from the evidence beyond a reasonable doubt:
>
> First, that on or about February 9, 1994, in the County of Scott, State of Missouri, the *defendant tried to have sexual intercourse with Linda Mays,* and
>
> Second, that such conduct was a substantial step toward the commission of the offense of rape upon Linda Mays, and
>
> Third, that defendant engaged in such conduct for the purpose of committing such rape,
>
> then you will find the defendant guilty under Count II of an attempt to commit rape.
>
> However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense.
>
> A person commits the crime of rape if he has sexual intercourse with another person without that person's consent by the use of forcible compulsion.
>
> Forcible compulsion means either (a) physical force that overcomes reasonable resistance or (b) a threat, express or implied, that places a person in reasonable fear of death or serious physical injury or kidnapping of himself or another person.
>
> As used in this instruction, the term "substantial step" means conduct which is strongly corroborative of the firmness of the defendant's purpose to complete the commission of the offense of rape. [Emphasis added.]

Defendant argues that the italicized words failed to describe the conduct that constituted the attempt to rape, that the instruction "allowed [the jury] to make their own determination as to what constituted attempted rape."

■ "For instructional error to rise to the level of plain error, the trial court must have so misdirected or failed to instruct the jury as to cause manifest injustice or miscarriage of justice." *State v. Cline,* 808 S.W.2d 822, 824 (Mo. banc 1991). *See also, State v. Nolan,* 872 S.W.2d 99, 103 (Mo. banc 1994). The applicable Notes on Use, MAI–CR 3d (1–1–87), directed:

> If the conduct alleged to constitute the substantial step is actually trying to achieve the result of the object crime, it should be described in general terms, as "shot at Joe Doe," *"tried to have sexual intercourse with Susan Doe,"* "tried to

2. The 1–1–87 version of MAI–CR 3d was in effect the date of defendant's trial, November 28, 1994.

start a fire (in a particular building)," etc. [Emphasis added.][3]

There was no error. Point III is denied.

### No. 21851

■ Defendant testified at the trial in his criminal case. He asserts in his Rule 29.15 motion that he was denied effective assistance of trial counsel because his trial counsel told him he had to take the stand. He claims he "was not told that his prior arrests were not admissible before the jury." The motion contends he "was prejudiced because other bad acts, evidence otherwise inadmissible, was before the jury as a result of [trial] counsel's failure to prepare [him]."

The motion court found, "[Defendant] testified at the trial after having been questioned by the Court and specifically advised of his rights not to testify." It concluded:

> The Court finds that there is no credible evidence that [defendant] was forced to testify against his will. [Defendant] did not call his prior defense counsel as a witness regarding such allegations. Again, the Court is not required to believe self-serving testimony even if uncontradicted. *Sanders v. State,* [790 S.W.2d 497 (Mo. App.1990) ]. Furthermore, such allegations are not self proving. *Newman v. State,* 669 S.W.2d 617 [ (Mo.App.1984) ].

During the trial of defendant's criminal case, the trial court advised him concerning his right to refrain from testifying. This occurred outside the presence of the jury just prior to his testimony. The trial court asked defendant if he understood he did not have to testify. Defendant answered, "Yes, sir." Defendant was asked if he understood that he had a right to remain silent; that he did not have to take the witness stand, just like he did not have to give a statement to police. Defendant answered, "Yes."

The trial court then asked the following questions and defendant gave the following answers:

> Q. What I'm telling you is, if you take the stand, as they say, anything can be

used against you. That means that [the prosecutor] has a chance to cross-examine you, just like your attorney has cross-examined the other witnesses that have been on the stand. Do you understand that?

> A. Yes.

> Q. It's up to you. I'm not telling you to testify or not to testify. You can do that if you want to, but you don't have to. You understand what I'm saying?

> A. Yes.

■ Appellate review of a post-conviction court's findings and conclusions is limited to determining if they are clearly erroneous. *State v. Starks,* 856 S.W.2d 334, 336 (Mo. banc 1993). The findings and conclusions about which defendant complains are not clearly erroneous. Point IV is denied.

### Dispositions of Appeals

The judgment of conviction in No. 20024 is affirmed. The judgment in No. 21851 denying defendant's Rule 29.15 motion is affirmed.

MONTGOMERY, C.J., and SHRUM, J., concur.

---

**3.** The Notes on Use to the 10–1–95 version contained the same language. The language is not part of the 7–1–97 Notes on Use now in effect.