STATE of Missouri, Respondent,

v.

Timothy S. CHANEY, Appellant.

No. 79595.

Supreme Court of Missouri,
En Banc.

March 24, 1998.

Rehearing Denied April 21, 1998.

Melinda K. Pendergraph, Asst. Public Defender, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for Respondent.

HOLSTEIN, Judge.

A jury convicted Timothy Chaney of murder in the first degree. The trial court sentenced Chaney to death in accordance with the jury's recommendation. This Court has exclusive appellate jurisdiction in all cases in which the death penalty is imposed. Mo. Const. art. V, sec. 3. The conviction is affirmed. The defendant is ordered resentenced to life imprisonment without eligibility for probation, parole or release as the sentence of death is disproportionate when compared to other like cases in which the death penalty was imposed. See sec. 565.035.[1]

### I.

This Court reviews the facts in the light most favorable to the verdict. *State v. Clemons*, 946 S.W.2d 206, 213 (Mo. banc), cert. denied, —— U.S. ——, 118 S.Ct. 416, 139 L.Ed.2d 318 (1997).

Around eleven o'clock on Saturday morning, April 8, 1995, thirteen-year-old Stephanie Steele called her friend Michelle Winter, who was three weeks away from her thirteenth birthday. Stephanie asked Michelle if she wanted to spend the afternoon together. Michelle received permission from her mother and changed into a brand new sweater that her mother had purchased for her the previous Wednesday. This was the first time

---

1. All statutory references are to RSMo 1994 unless otherwise indicated.

Michelle had worn the sweater. Michelle left the house on foot to meet Stephanie, but did not say goodbye to her mother. Stephanie and Michelle walked to the library together, then walked to a fast food restaurant, and then stopped at a gas station to buy soda and candy. While at the gas station, they ran into Michelle's mother, Jackie Nowak, who chided Michelle for not letting her know when she had left the house. The girls walked back to Stephanie's house. They used the typewriter and watched the television in Stephanie's bedroom. Michelle called her mother around 3:30 p.m. and assured her that she would not leave without calling her first. Michelle fell asleep on Stephanie's bed.

Later that afternoon, Timothy Chaney, Stephanie's stepfather, came into Stephanie's bedroom and told her that he was going around the corner to get his van washed. Stephanie's mother, Wendy Chaney, was asleep. At 4:50 p.m., both girls left the house, but walked in opposite directions. Stephanie turned north to return a videotape, and Michelle walked south to return home. Michelle then turned east on the street where she lived. Neighbors saw her around five o'clock walking toward her house carrying a book bag.

At six o'clock, Jackie Nowak called Stephanie's house to tell Michelle to return home. Stephanie told her that Michelle had left her house around 5:00 p.m. After driving around the neighborhood without success in finding Michelle, Jackie returned home and called the Springfield police.

Timothy Chaney had not yet returned home. Wendy Chaney asked her next-door neighbors, Richard and Cheri Nelson, if they knew of her husband's whereabouts. They did not. Timothy Chaney returned home in the van around 9:00 to 9:30 p.m. Wendy and Timothy Chaney then drove Wendy's car to Jackie Nowak's house to let her know that they would search near the mall.

The next day, a police detective questioned Timothy Chaney and noted that he had tears in his eyes, and that when Chaney's voice broke in mid-sentence, he had to stop to regain his composure. Later that day, Richard Nelson asked Chaney where he had been the night before. Chaney told Nelson that he had driven to Linden Lure off of route 60 to go fishing, but fell asleep because he had been drinking beer that afternoon.

On April 12, a police investigator questioned Timothy Chaney at his optical business as to his whereabouts Saturday afternoon and evening. Chaney told the officer that he and his wife had gone to a bar Saturday afternoon, had a couple of beers, and returned home around 2:30 p.m. According to Chaney, at 4:30 p.m. he took the van to be washed, but as the car wash was full, he decided to go fishing instead. He then claims he drove to Springfield Lake, did some fishing, but lost his only two lures in the first ten to fifteen minutes. He stated that he then went to the James River, which runs into Springfield Lake, to fish off of the bank. At this point in the questioning, the officer asked Chaney how he could continue fishing without any lures and, after a long pause, Chaney responded that he was just going to look for a spot to go in the future. Chaney stated that after failing to find access to the James River, he continued south through Sparta, saw a sign for Linden and had heard that Linden Lure was a good place to fish. The officer thought this was odd, because if Chaney had been traveling south, he would have passed through Linden before Sparta. Chaney told the officer that he drove to Linden Lure and watched two fisherman for a while and then fell asleep. He claims that when he woke up around 7:00 or 7:30 p.m. and started home, he turned south by mistake, so he took 14 Highway south to the city of Ozark, and then caught U.S. 65 north to Springfield.

On April 14, an officer of the Missouri State Water Patrol discovered Michelle's body off of an undeveloped cul-de-sac near Cape Fair in Stone County, less than a one-hour drive south of Chaney's house. Timothy Chaney was familiar with the Cape Fair area as he had previously gone camping and fishing there and had a business in a nearby community.

Michelle's body was partially covered by leaves. Her sweater was rolled up to her neck, exposing her chest. Her jeans were undone and pulled down exposing her pubic

area. She had on no undergarments. Her left shoe was missing.

The autopsy revealed that Michelle had suffered several blows to the head and four stab wounds to the right and middle chest area. The pathologist who examined the victim stated the condition of the body was consistent with a body that may have been in the woods since shortly after her disappearance. She died from the stab wounds, which had pierced her heart and lungs. The wounds were round, ice pick type injuries. Her sweater had no holes in it. Scratches on the underside of her body demonstrated that her body had been dragged to the spot after her death. She had bruises on her shins, which suggested that she struggled before her death. She had two bruises on the right side of her neck, which occurred before her death. The contents of her stomach included a few fragments of brownish nut material. Sexual assault tests were performed. There was no injury to her genitalia. There was no evidence of semen or penetration.

Later that day, police officers searched Chaney's home. Timothy Chaney was advised of his Miranda rights. He told the officer that he and his wife had consumed two pitchers of beer the afternoon of Michelle's disappearance. He remembered the additional detail that after failing to find access to the river he had passed a cemetery and noticed a headstone with the name of "Holland." It caught his eye because that was the name of his business partner. He purchased twenty dollars worth of gas with a twenty dollar bill at the station by the cemetery and then continued south. He remembered that there was a young boy floating in an inner tube at Linden Lure. He also remembered that he saw someone being placed in handcuffs by police officers at a gas station in the city of Ozark. On this occasion, Chaney did not mention driving through Sparta or the two fishermen at Linden Lure. The police did not find anyone who remembered seeing Timothy Chaney on April 8 at Lake Springfield, Linden Lure, Ozark, or the gas station near the cemetery.

On April 14, police towed Chaney's van to the police station, where it was searched and vacuumed for trace evidence. There was standing water underneath the mats in the back of the van, and water in the step wells in the front. There were pieces of peanuts on the floor of the front passenger side.

Later in the afternoon, Timothy Chaney spoke with the Nelsons again about Michelle. He told them he had been at Lake Springfield the night she disappeared. Chaney also expressed concern that Michelle's hair or something else from her person might be in the van for reasons other than Michelle having been in the van. He stated that, to his knowledge, it had been a year since Michelle had actually been in the van.

On August 22, the police returned to the Chaney residence to conduct a second search of the van. Timothy Chaney asked if he could remove his gray tool box from the van. He was denied permission, and became agitated. An awl-like tool consistent with Michelle's wounds was found in a tire repair kit in the gray tool box. Various paint samples, carpet fibers, and a hair were also obtained.

Michelle's clothing was examined for foreign evidence not common to her clothes and not common to the wooded area in which she was found. A forensic scientist found pieces of steel blue rubber, red paint chips with a layer of rust, red-orange paint chips, dark metallic blue automotive paint chips, pieces of paper painted dark blue, turquoise paint chips with a white primer coat, tiny brown iron spheres, metallic shavings, and shreds of foil. Examination of the vacuumings from the back of the van produced identical pieces of material. Molecular testing revealed that each category of material had a common source. Metal shavings found on Michelle's clothing and in the van vacuumings were of the same elemental composition as samples of metal grindings obtained during a May 13, 1996 search of Chaney's optical business.

Pieces of glitter, turquoise-colored fibers, what appeared to be black animal hairs, and what appeared to be insect droppings were found on Michelle's clothing and in the vacuumings from the back of the van, but tests were not conducted to confirm common sources. The state's forensic analyst testified that Michelle would have had to have been lying down in the back of the van to

pick up the amount of material that was found on her clothing. She also testified that the combination of materials found on Michelle's clothes and vacuumed from the back of the van was so unique that the "likelihood that you would find this pool anywhere else but [the back of the van] is so unlikely it's astronomical." The analyst further testified that particles as heavy as the iron spheres and paint chips found on the victim would have tended to fall off if the victim had been up and active after acquiring the particles.

Two head hairs inconsistent with Michelle's hair were found on her clothes. When compared with Timothy Chaney's hair, the samples were indistinguishable under a microscope.

Two hairs found in the vacuumings from the back of Chaney's van were similar in appearance to Michelle's hair, and were not similar to Chaney's hair. DNA testing could be performed on these hairs, because scalp tissue was attached to them. That testing was performed and indicated that these hairs were consistent with the genetic profile of the victim and inconsistent with the genetic profile of Timothy Chaney. Less than one half of one percent of the population have the same genetic profile as the victim.

## II.

■ Chaney first argues that the evidence against him was insufficient to support a conviction.

■ When reviewing the sufficiency of evidence supporting a criminal conviction, the Court does not act as a "'super juror' with veto powers," *State v. Grim*, 854 S.W.2d 403, 414 (Mo. banc 1993), but gives great deference to the trier of fact. In *Grim* this Court stated that the standard to be applied in reviewing the sufficiency of the evidence "echoes the due process standard announced by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)." 854 S.W.2d at 405. Appellate "review is limited to a determination of whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt." *Id.* (quoting *State v. Dulany*,

781 S.W.2d 52, 55 (Mo. banc 1989)). In applying this standard, "the Court accepts as true all of the evidence favorable to the state, including all favorable inferences drawn from the evidence and disregards all evidence and inferences to the contrary." *Id.*

In *Jackson*, the United States Supreme Court emphasized the great deference to be given to the trier of fact: "[T]his inquiry does not require a court to ask itself whether it believes that the evidence at trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 318–19, 99 S.Ct. at 2789 (citation omitted) (quoting *Woodby v. INS*, 385 U.S. 276, 282, 87 S.Ct. 483, 486, 17 L.Ed.2d 362 (1966)). Applying these criteria, a rational factfinder could have found Chaney guilty beyond a reasonable doubt of first degree murder.

From the evidence the jury could properly find that Chaney and the victim were together in the van after 5:00 p.m. on April 8, 1995. The victim's whereabouts were accounted for until that time, and at no time prior to leaving the Chaney home was she in the van. Chaney and the victim both left his home just before 5:00 p.m. and headed in the same direction. The victim disappeared shortly thereafter. Although neighbors saw the victim walking towards her house, the sound of the victim screaming or other unusual noises were not heard. This absence of commotion permits a reasonable inference that the victim voluntarily got into a vehicle being driven by someone she knew, such as the defendant.

Also more than coincidental was Chaney's absence in the van for several hours at the time of the victim's disappearance. He was away from his home from about 4:30 p.m. to about 9:00 p.m. the night the victim disappeared for the announced purpose of washing his van. However, Chaney's wife had *no idea* where he was during that time period.

The location where the body was found also connected Chaney to the murder. Although the victim's body was found in a wooded area about a one hour drive from

Chaney's home in Springfield, Chaney was familiar with the area as he had previously gone camping and fishing there and had a business in a nearby community.

Other circumstances pointing to Chaney are his unusual actions and statements after the murder, indicating guilty knowledge of the crime. "A permissible inference of guilt may be drawn from the acts or conduct of a defendant, subsequent to an offense, if they tend to show a consciousness of guilt and a desire to conceal the offense or a role therein." *State v. Isa*, 850 S.W.2d 876, 894 (Mo. banc 1993).

Chaney's testimony regarding his whereabouts on the evening of the victim's disappearance contains numerous inconsistencies with statements he made before trial to police, neighbors, and Chaney's wife. When confronted with inconsistencies, Chaney denied making inconsistent statements and explained that all of the other witnesses were mistaken as to what he said or did. As the trier of fact, the jury was entitled to believe that his shifting explanations, coupled with his inability to corroborate his whereabouts during the critical time period, were part of an overall plan to lie to conceal his guilt.

Chaney's efforts to conceal his involvement in the murder included an attempt to remove his tool box from his van before the police seized it. In the tool box was an awl used as a tire repair tool. The awl was consistent in size with the weapon used to stab the victim. Police officers also found water under the mat in the back of the van when it was searched just a few days after the crime. Before it was disclosed that human hair identified as the victim's had been found in the back of the van, Chaney asked a neighbor what police would think if they found the victim's hair or similar matter in the van. From this evidence, a reasonable jury could conclude that Chaney was concerned about trace evidence of the victim and had recently washed the interior of the van in an effort to conceal that evidence.

The strongest evidence against Chaney was the physical evidence. Chaney told his neighbors that the victim had not been in the van for a year. Yet two hairs found in Chaney's van were shown by DNA testing to be consistent with that of the victim. The state's expert testified that the materials found on the victim's clothing were a "highly unique collection of particles," and the likelihood that this collection of particles could come from anywhere other than Chaney's van was "astronomical." The state's expert further testified that in order to pick up the large amount of materials that the victim had on her clothing, the victim would have had to have been lying in the debris.

Thus, the state's evidence confirms not only that the victim was in the back of Chaney's van after 5:00 p.m. on the day of her disappearance, but that the victim was lying in the back of Chaney's van on that day. By Chaney's own admission, he was driving the van from about 5:00 p.m. to 8:30 p.m. that evening. The state's expert also testified that activity or walking would have tended to remove much of the heavier particles found on the victim. Assuming, as we must, that the jury believed the state's expert, a rational juror could conclude from all of this evidence that the victim was lying in the rear of the van driven by Chaney after her disappearance and that the victim was never active or walking after she left the van.

From the above evidence, a reasonable juror might have found beyond a reasonable doubt that Chaney was guilty of first degree murder. While no one piece of evidence viewed in isolation may have been sufficient, the totality of the evidence, if believed, points to the defendant's guilt.

The facts of this case undeniably support conflicting inferences. For example, it is possible that the victim was either in the van on the day of her disappearance without anyone's knowledge or recollection, or that the victim acquired debris consistent with that found in the van while in the Chaney home. It is also possible that hair matching that of the victim was brought into the van by someone other than the victim. An appellate court "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that reso-

lution." *Jackson*, 443 U.S. at 326, 99 S.Ct. at 2793. The conviction in this case would require reversal only under a rule that the prosecution was under an affirmative duty to disprove every reasonable hypothesis except that of guilt. In *State v. Grim* this Court rejected such a rule. See 854 S.W.2d at 405–08 (abrogating the circumstantial evidence rule).

Chaney argues that he must be acquitted because the evidence supports an equally valid inference of innocence. The equally valid inferences rule appears to be unique to Missouri and states that "[w]here two equally valid inferences can be drawn from the same evidence, the evidence does not establish guilt beyond a reasonable doubt." *State v. Roberts*, 709 S.W.2d 857, 862 (Mo. banc 1986) (quoting *State v. Black*, 611 S.W.2d 236, 240 (Mo.App.1980)). Chaney argues that *Grim* did not abrogate this rule. See *State v. Alul*, 948 S.W.2d 215, 217 (Mo.App.1997); *State v. Dooley*, 919 S.W.2d 539, 541 (Mo.App.1995); *State v. Mayfield*, 879 S.W.2d 561, 564–65 (Mo.App.1994); see also *State v. Hodge*, 927 S.W.2d 500, 502 (Mo.App.1996); *State v. Idlebird*, 896 S.W.2d 656, 661 (Mo.App.1995). But see *State v. Ford*, 906 S.W.2d 761, 765 n. 3 (Mo.App.1995) (acknowledging that the Court in *Grim* likely rejected the equally valid inferences rule).

The equally valid inferences rule was effectively abolished by *State v. Grim*. The Court in *Grim* noted that the equally valid inferences rule conflicts with and renders meaningless the requirement that the appellate court presume that the trier of fact drew all reasonable inferences in favor of the verdict. See 854 S.W.2d at 413–14. Because the equally valid inferences rule is at war with the due process standard governing an appellate court's review of the sufficiency of evidence, the equally valid inferences rule should no longer be applied. Rather, the standard to be applied is the due process standard set forth in *State v. Grim* and *Jackson v. Virginia*. In any event, due process is clearly the governing standard in this case because Chaney's point-relied-on raises only a due process challenge to the sufficiency of the evidence.

Moreover, the evidence in this case does not support an equally valid inference of innocence. Chaney argues that it was equally valid for the jury to infer that the trace particles found on the victim came from the Chaney home. However, the state's expert testified that the likelihood that the collection of particles found on the victim could come from anywhere other than Chaney's van was astronomical. The state's expert also testified that many of the heavier particles found on the victim's body would have fallen off as the victim walked about after leaving the Chaney home. In view of this testimony, it is unlikely that the particles were on her when she left the Chaney home.

The trial record contains sufficient evidence to convince a rational factfinder of guilt beyond a reasonable doubt.

### III.

Chaney next argues that the trial court erred in precluding evidence that a known pedophile who lived near the victim had lied to the police about his whereabouts at the time of the victim's disappearance and was familiar with the area where the victim's body was found.

Chaney's offer of proof was that on April 16, 1995, the police questioned an individual living a block and one half from the victim regarding the murder. The individual told the police that he was unaware of the murder and did not know the victim. The individual stated that he was working on the day of the victim's disappearance. However, when the police checked with his work, they discovered that he was not working that day.

According to the offer of proof, when again questioned by the police, the individual stated that he did remember that he was off and he had been at the Elks Lodge all day. He said that he stayed and played cards until 8:30 p.m. and then left and went straight home. He named several individuals whom he played cards with. The defense stated that all these individuals could be called to establish that there was no card game after 5:30 p.m. The bartender at the Elks Lodge told the police that the game broke up that day before 5:00 or 5:30 p.m. and that she locked up the card room at that time. She

stated that she was positive that the individual was not there when she locked up.

The defense further offered to prove that when later questioned by the police, the individual admitted that he had lied about his whereabouts. He then admitted that he had left the Elks Lodge at 5:00 p.m. and had gone to a strip-bar in Springfield. He stated that he stayed there until after dark, then returned home and went to bed. After further discussion, the individual admitted that he was again not telling the truth. He said that he was scared and did not want anyone to think that he was involved. He then gave a further statement that after he left the Elks Lodge at about 5:30 p.m., he drove to a store and then went home. He stated that he went to sleep for two or three hours and denied seeing the victim.

The defense further offered testimony from the individual's next door neighbors. They would testify that they monitored the individual's comings and goings because he was a known pedophile. The neighbors would also testify that the individual did not return home on the evening of Saturday, April 8, as he had stated, but returned late Monday evening.

■ Though discussed by defense counsel in the pre-trial motion hearing, the offer of proof contained no evidence that the individual was familiar with the area where the victim's body was found. Such evidence will not be considered on appeal as it was not preserved by presentation to the trial court in the defendant's offer of proof. See *State v. Townsend*, 737 S.W.2d 191, 192 (Mo. banc 1987).

■ The trial court has broad discretion to admit or exclude evidence at trial and this Court will reverse only upon a showing of a clear abuse of discretion. *State v. Simmons*, 944 S.W.2d 165, 178 (Mo. banc), cert. denied, — U.S. ——, 118 S.Ct. 376, 139 L.Ed.2d 293 (1997). "Evidence that another person had an opportunity or motive for committing the crime for which the defendant is being tried is not admissible without proof that such other person committed some act directly connecting him with the crime." *State v. Schaal*, 806 S.W.2d 659, 669 (Mo.

banc 1991) (quoting *State v. Easley*, 662 S.W.2d 248, 251–52 (Mo. banc 1983)).

The evidence offered does not establish an act directly connecting another to the crime. Chaney argues that the individual's lying to the police about his whereabouts and the neighbors' testimony that he was a known pedophile directly connects the individual to this crime. However, testimony by a neighbor that the individual was a known pedophile is irrelevant as it shows only that the individual had a bad reputation. See *State v. Phillips*, 940 S.W.2d 512, 522–23 (Mo. banc 1997) (holding that evidence of another person's bad character is irrelevant); *State v. Bernard*, 849 S.W.2d 10, 16 (Mo. banc 1993) (holding that evidence of repeated acts of sexual abuse of children is not admissible to show a propensity to commit such crimes). The individual's lying to the police only may indicate a guilty conscience. But this evidence, standing alone or in conjunction with the person's status as a pedophile, does not establish an act directly connecting the individual to the crime and is inadmissible as it would "have no other effect than to cast a bare suspicion on another, or to raise a conjectural inference as to the commission of the crime by another...." *State v. Umfrees*, 433 S.W.2d 284, 288 (Mo. banc 1968).

## IV.

■ Chaney contends that the trial court improperly allowed the prosecution to ask Chaney on cross-examination whether anyone could confirm his whereabouts after he left his home on the day of the victim's disappearance.

On direct examination Chaney testified that he traveled a circuitous route to various locations on the night the victim disappeared. Chaney stated that he saw several people as he drove around. On cross-examination, the prosecutor asked Chaney, "Can you name one person who saw you or can confirm any part of your story as to your whereabouts from the time you left home on the late afternoon of April 8 th, 1995, until April— until sometime in the neighborhood of nine o'clock that evening?" Defense counsel objected to the form of the question as being argumentative. The court overruled the ob-

jection and the prosecutor repeated the question, "Sir, can you name a single person who can confirm any part of your story as to your whereabouts from roughly 4:30 in the afternoon on April 8th, 1995, until sometime in the neighborhood of 9:00 p.m. on that same date?"

Though never objected to at trial on constitutional grounds, Chaney now argues that the prosecutor's questioning violated his right to due process because it improperly shifted the burden of proof to Chaney to prove his innocence. Because the questioning was not objected to on due process grounds, this claim will be reviewed only for plain error. Relief will be granted only if the error resulted in "manifest injustice" or a "miscarriage of justice." Rules 29.12 and 30.20.

 When a defendant testifies in his own behalf, he may be cross-examined, contradicted or impeached the same as any other witness. *State v. Davison*, 457 S.W.2d 674, 676 (Mo.1970). "Wide latitude is allowed on cross-examination in criminal cases and the trial court is invested with broad discretion in determining the extent of such inquiry." *State v. Evans*, 802 S.W.2d 507, 512 (Mo. banc 1991). When a defendant elects to testify in his own defense, he may be cross-examined "in detail as to matters generally referred to in direct examination." *State v. Shurn*, 866 S.W.2d 447, 463 (Mo. banc 1993).

Chaney correctly points out that it is impermissible to draw an adverse inference from the defendant's failure to call a witness when the witness was equally available to both parties. See *State v. Chunn*, 784 S.W.2d 228, 230–31 (Mo.App.1989). However, in this case the state did not attempt to draw an adverse inference from Chaney's failure to call an available witness. Rather, the state attempted to draw an unfavorable inference from the defendant's admission that there was no witness available to corroborate his story.

 The state does not improperly shift the burden of proof by referring to a defendant's failure to offer evidence, so long as the state makes no reference to a defen-

dant's failure to testify. *State v. Phillips*, 940 S.W.2d 512, 519 (Mo. banc 1997). Prosecutors are entitled to argue matters supported by the evidence or matters reasonably inferable from the record, and may point out to the jury an absence of evidence to support a theory suggested by the defendant. *State v. Mease*, 842 S.W.2d 98, 110 (Mo. banc 1992). References to "the Defendant's lack of corroborating evidence are not prohibited and do not constitute improper shifting of the burden of proof...." *State v. Macon*, 845 S.W.2d 695, 696 (Mo.App.1993); accord *State v. Richardson*, 923 S.W.2d 301, 314 (Mo. banc), cert. denied, —— U.S. ——, 117 S.Ct. 403, 136 L.Ed.2d 317 (1996).

The trial court did not violate Chaney's due process rights by allowing the prosecution to ask Chaney on cross-examination whether there were any witnesses who could corroborate his story.

### V.

 Chaney argues that the trial court plainly erred in overruling defense counsel's objection to the endorsement of the state's DNA expert after jury selection had begun.

During jury selection on Friday, November 15, 1996, the prosecutor moved to formally endorse a DNA expert as a witness. The prosecutor indicated that the witness had been disclosed to defense counsel long before trial and that defense counsel had been given a copy of the expert's report. Defense counsel acknowledged that he had been given a copy of the expert's report months before, but stated that he had not yet spoken to the witness. The trial court ordered the state to make the witness available to the defense that night.

When the jury was sworn the following Monday, defense counsel did not request a continuance or indicate that he needed more time to interview the witness. When the state's expert took the stand on November 19, 1996, appellant's counsel did not allege that he was unprepared to cross-examine the state's expert and did not raise the issue of the expert's late endorsement.

Defense counsel objected to the late endorsement, but failed to include this claimed

error in the motion for new trial. Because the issue was not raised in Chaney's motion for new trial, it was not preserved for appellate review. The Court will review this point for plain error only. See Rules 29.12 and 30.20.

■■■ The trial court has broad discretion in permitting the late endorsement of additional witnesses. *State v. Sweet*, 796 S.W.2d 607, 613 (Mo. banc 1990). Among the factors to be considered in determining if the trial court abused its discretion are: (1) whether the defendant waived the objection; (2) whether the state intended surprise or acted deceptively or in bad faith, with the intention to disadvantage the defendant; (3) whether in fact defendant was surprised and suffered any disadvantage; and (4) whether the type of testimony given might readily have been contemplated. *Id.*

The record does not indicate that the state intended to surprise the defendant or acted in bad faith to disadvantage the defense. The state disclosed the existence of the expert witness and provided defense counsel with the expert's report months before trial. The defense should have anticipated that expert DNA testimony would be given at trial. Defense counsel was given an opportunity to prepare to cross-examine the expert and did not request a continuance or more time to prepare. Moreover, Chaney fails to show prejudice by specifying what defense counsel would have done to exculpate the defendant had there been more time to prepare for this witness.

The trial court did not commit plain error when it allowed the state to endorse the expert.

## VI.

■■■ Chaney next contends that the trial court erred during death qualification of the jury panel by prohibiting defense counsel from asking, "Would anyone here characterize themselves as a strong supporter of the death penalty?"

Chaney points out that a prospective juror who will vote for the death penalty irrespective of the facts or instructions of law must be removed. See *Morgan v. Illinois*, 504 U.S. 719, 726, 112 S.Ct. 2222, 2228, 119 L.Ed.2d 492 (1992). Chaney argues that without this question, defense counsel was unable to evaluate whether a prospective juror would always impose the death penalty.

■■■ "A trial court's ruling on whether to allow a voir dire question will be reversed only for abuse of discretion." *State v. Hall*, 955 S.W.2d 198, 203 (Mo. banc 1997). It is permissible for a court to prohibit broad questioning about how a prospective juror thinks or feels. *State v. Kreutzer*, 928 S.W.2d 854, 864 (Mo. banc 1996), cert. denied, ── U.S. ──, 117 S.Ct. 752, 136 L.Ed.2d 689 (1997). The relevant inquiry is whether a prospective juror can follow the law. See *State v. Feltrop*, 803 S.W.2d 1, 8 (Mo. banc 1991).

The trial court did not abuse its discretion in prohibiting the broad question of whether any prospective juror was a strong supporter of the death penalty. The prosecutor questioned the jury panel about their ability to impose the death penalty or a sentence of life imprisonment without parole. Defense counsel then questioned the panel about whether anyone believed that the death penalty was appropriate in all cases where someone was murdered. Defense counsel also asked whether everyone understood that the death penalty was not to be automatically given to everyone who is convicted of murder. These questions provided Chaney an adequate opportunity to determine whether a prospective juror would always impose death following conviction. The trial court allowed sufficient latitude in determining whether each prospective juror could fairly and impartially follow the court's instructions. In view of the questioning permitted by the trial court, the broad question prohibited would not have elicited any additional relevant information. The trial court did not abuse its discretion to prohibiting the open-ended voir dire question as to the panel's views on the death penalty.

## VII.

■■■ Chaney argues the statutory aggravating circumstance instruction submitted in the penalty phase was unconstitutionally vague and unsupported by the evidence.

The aggravating circumstances instruction, adapted from Missouri Approved Instructions – Criminal 313.40, reads as follows:

In determining the punishment to be assessed against the defendant for the murder of Michelle Winter, you must first unanimously determine whether the following statutory aggravating circumstances exists:

Whether the murder of Michelle Winter involved depravity of mind and whether, as a result thereof, the murder was outrageously and wantonly vile, horrible, and inhuman. You may make a determination of depravity of mind only if you find:

That the defendant killed Michelle Winter after she was bound or otherwise rendered helpless by the defendant and that defendant thereby exhibited a callous disregard for the sanctity of human life.

You are further instructed that the burden rests upon the State to prove the foregoing circumstances beyond a reasonable doubt. Therefore, if you do not unanimously find from the evidence beyond a reasonable doubt that the foregoing statutory aggravating circumstance exists, you must return a verdict fixing the punishment of the defendant at imprisonment for life by the Department of Corrections without eligibility for probation or parole.

Chaney attacks the sufficiency of the evidence to support this aggravating circumstance.

Reasonable jurors could have found from the evidence that the victim was rendered helpless before Chaney murdered her. In the light most favorable to the jury's finding, the evidence showed that the victim had seven areas of deep round bruises to her scalp, which were inflicted with a blunt round object that was about one half to one inch in diameter. According to the pathologist who examined the victim, these head injuries were sufficient to render the victim unconscious. The pathologist also found four puncture wounds in the middle of the victim's chest, consistent with the use of an object such as an ice pick. These wounds were close together and fit within a three inch circle. Three of these wounds went through the victim's breastbone and completely

through the victim's heart. One of these wounds went through the victim's breastbone and into the victim's right lung. Because the wounds were close together and straight plunge-type injuries, which would be difficult to administer to a struggling person, and because there were no defensive injuries, the state's pathologist testified that the victim was unconscious when the fatal stab wounds were inflicted. He also testified that the victim died as a result of the stab wounds to her chest. From this evidence, reasonable jurors could have inferred that Chaney murdered the victim after he rendered her helpless.

Chaney argues that the language of this aggravating circumstances instruction is unconstitutionally vague. In this case, the jury was specifically provided guidance on when they could find this aggravating circumstance. This Court has repeatedly held that "such language and limiting instruction provides sufficient guidance to the sentencing jurors and that the instruction is not unconstitutionally vague." *State v. Tokar*, 918 S.W.2d 753, 772 (Mo. banc), cert. denied, —— U.S. ——, 117 S.Ct. 307, 136 L.Ed.2d 224 (1996).

## VIII.

■ Chaney next contends that the trial court committed plain error in allowing the state to elicit testimony regarding prior bad acts of Chaney's during the penalty phase.

The state called five witnesses during the penalty phase who testified about prior bad acts of Chaney including instances of sexual and physical assault on Chaney's former teenage wife and her minor sisters and illegal drug dealing and use. All of these acts occurred ten to twenty-six years before the trial. The prosecutor argued the unadjudicated bad acts as a basis for the death sentence and asserted that the acts erased any doubt of Chaney's guilt.

Defense counsel failed to object to any of these witnesses' testimony or the prosecutor's argument. Asserting that the admission of testimony regarding unadjudicated bad acts violates his right to due process and his rights under the Eighth Amendment,

Chaney request plain error review under Rules 29.12 and 30.20.

 It is well established that "prior unadjudicated criminal conduct may properly be heard by a jury during the penalty phase of a trial." *State v. Simmons*, 955 S.W.2d 729, 740–41 (Mo. banc 1997), cert. denied, — U.S. ——, 118 S.Ct. 1081, 140 L.Ed.2d 138 (1998). Chaney argues, however, that the evidence should have been excluded in this case because the acts were too remote to be of probative value because the acts occurred ten to twenty-six years before the trial. However, any question of remoteness was for the jury. The jury had the ability to weigh the probative value of this evidence as it was aware that the bad acts testified to occurred many years ago and did not result in criminal convictions. The admission of this evidence did not constitute plain error.

### IX.

In Chaney's next point, he contends that the trial court erred by allowing the prosecutor to make numerous improper statements during the state's closing argument in the penalty phase. Chaney requests plain error review as none of these claims were preserved for appeal through proper objection at trial and in the motion for new trial.

 "The 'plain error' rule is to be used sparingly and may not be used to justify a review of every point that has not been otherwise preserved for appellate review." *State v. Roberts*, 948 S.W.2d 577, 592 (Mo. banc 1997), cert. denied, — U.S. ——, 118 S.Ct. 711, 139 L.Ed.2d 652 (1998). "Unless a claim of plain error facially establishes substantial grounds for believing that 'manifest injustice or miscarriage of justice has resulted,' this Court will decline to exercise its discretion to review for plain error under Rule 30.20." *Id.*

None of Chaney's unpreserved claims regarding closing argument raise a substantial ground for finding plain error. Therefore, we decline to subject these claims to our discretionary review under Rule 30.20.

### X.

Chaney asserts that proceedings under Rule 29.07(b)(4) violate the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution and Article I, section 10, 18(a) and 19 of the Missouri Constitution. This Court again rejects this argument. *State v. Roll*, 942 S.W.2d 370, 379 (Mo. banc); cert. denied, — U.S. ——, 118 S.Ct. 378, 139 L.Ed.2d 295 (1997); *State v. Debler*, 856 S.W.2d 641, 652–53 (Mo. banc 1993); *State v. Ervin*, 835 S.W.2d 905, 931 (Mo. banc 1992).

### XI.

 Section 565.035 requires this Court to conduct an independent review of the defendant's death sentence. The statute directs the Court to determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both [sic] the crime, the strength of the evidence and the defendant." Sec. 565.035.3(3). When conducting proportionality review under this statute, "this Court makes a review of the whole record, independent of the findings and conclusions of the judge and jury." *State v. Ramsey*, 864 S.W.2d 320, 328 (Mo. banc 1993).

 This independent statutory review "is designed by the legislature as an additional safeguard against arbitrary and capricious sentencing and to promote evenhanded, rational and consistent imposition of death sentences." *Id.* In the vast majority of cases where the judgment is affirmed on the law, no new sentencing is required. *Id.* In such cases, "statutory review merely provides a backstop against freakish and wanton application of the death penalty." *Id.*

There are several cases in this state in which the defendant was sentenced to death for the horrendous crime of murdering a child. See *State v. Taylor*, 929 S.W.2d 209 (Mo. banc 1996); cert. denied, — U.S. ——, 117 S.Ct. 1088, 137 L.Ed.2d 222 (1997); *State v. Nunley*, 923 S.W.2d 911 (Mo. banc 1996); *State v. Brown*, 902 S.W.2d 278 (Mo. banc 1995); *State v. Petary*, 790 S.W.2d 243 (Mo. banc 1990); *State v. Lingar*, 726 S.W.2d 728 (Mo. banc 1987). This Court is also mindful of the similarity between this case and other cases in which the defendants, who were

sentenced to death, showed callous disregard for life by murdering people who were helpless or were rendered helpless by the defendants. See *State v. Tokar*, 918 S.W.2d 753 (Mo. banc), cert. denied, —— U.S. ——, 117 S.Ct. 307, 136 L.Ed.2d 224 (1996) (defendant fired first gunshot, rendering the victim helpless, and then fired a second lethal shot); *State v. Murray*, 744 S.W.2d 762 (Mo. banc 1988) (victims were shot while tied up); *State v. Walls*, 744 S.W.2d 791 (Mo. banc 1988) (elderly victim); *State v. Mallett*, 732 S.W.2d 527 (Mo. banc 1987) (victim incapacitated before the murder); *State v. Mathenia*, 702 S.W.2d 840 (Mo. banc 1986) (elderly victims); *State v. Battle*, 661 S.W.2d 487 (Mo. banc 1983) (elderly victim).

This Court must also consider "the strength of the evidence." Sec. 565.035.3(3). This aspect of proportionality review is uncommon among states having statutes mandating proportionality review.[2] It is clear from this mandate that the legislature intended for this Court, when reviewing the imposition of the death penalty, to go beyond a mere inquiry into whether the evidence is sufficient to support a conviction. To perform this duty necessarily requires a comparison of the weight of the evidence in other cases in which the death penalty was given.

In none of the cases cited above was the conviction based primarily on trace and pathological evidence of the type and quantity presented here. In this case there is no eyewitness, confession, admission, document, fingerprint or blood evidence directly pointing to the defendant. Neither is there evidence of defendant's involvement in any similar or related crimes from which one might infer his involvement here. While sufficient to allow a reasonable juror to find guilt beyond a reasonable doubt, the evidence here is not as strong as evidence in similar cases imposing the death penalty noted above. After comparing the evidence in this and similar death penalty cases, we conclude that this case falls within a narrow band where the evidence is sufficient to support a conviction, but not of the compelling nature usually found in cases where the sentence is death. See *State v. Watson*, 61 Ohio St.3d 1, 572 N.E.2d 97 (1991) (finding the evidence sufficient to convict, but setting aside the sentence of death based on a statutorily mandated independent review of the evidence).

In conducting proportionality review we must also consider "the defendant." Sec. 565.035.3(3). Evidence concerning his history of violent behavior and sexual abuse is of limited probative value, as the alleged acts were said to have all occurred ten to twenty-six years ago. Contrasted with that is evidence that Chaney had no prior criminal convictions and was a good husband, friend and step-father, and that he had a good reputation among those he worked for in his optical business.

The combination of the strength of the evidence and the defendant's background makes this case unlike other cases involving similar crimes in which the death penalty was imposed. Thus, we conclude the sentence of death is disproportionate.

## XII.

The death sentence is set aside and defendant is resentenced to life imprisonment without eligibility for probation, parole, or release except by act of the governor. Sec. 565.035.5(2). In all other respects, the judgment of the trial court is affirmed.

---

2. *See* Ala.Code sec. 13A–5–53(b)(3) (1994); Del. Code Ann. tit. 11, sec. 4209(g) (1995); Ga.Code Ann. sec. 17–10–35(c)(3) (1997); Ky.Rev.Stat. Ann. sec. 532.075(3) (Michie 1990); Miss.Code Ann. sec. 99–19–105(3) (Supp.1997); Mont. Code. Ann. sec. 46–18–310(1) (1997); Neb.Rev. Stat. sec. 29–2521.01(5) (1995); Nev.Rev.Stat. sec. 177.055.2 (1997); N.H.Rev.Stat. Ann. sec. 630:5(XI) (1996); N.J.Rev.Stat. sec. 2C:11–3.e (West Supp.1997); N.M. Stat. Ann. sec. 31–20A–4(C) (Michie 1994); N.Y.Crim. Proc. sec. 470.30.3 (McKinney Supp.1997–1998); N.C. Gen.Stat. sec. 15A–2000(d) (1988); 42 Pa. Cons. Stat. Ann. sec. 9711(h)(3) (West Supp.1997); S.C.Code Ann. sec. 16–3–25(C) (Law.Co-op.1985); S.D. Codified Laws sec. 23A–27A–12 (Michie 1988); Tenn.Code Ann. sec. 39–13–206(c)(1) (1997); Va.Code Ann. sec. 17–110.1.C (Michie 1996); Wash. Rev.Code Ann. sec. 10.95.130(2) (West Supp.1998). *But see* Ohio Rev.Code Ann. sec. 2929.05(A) (West 1997) (directing the reviewing court to "independently weigh all facts and other evidence disclosed in the record in the case and consider the offense and the offender to determine ... whether the sentence of death is appropriate").

BENTON, C.J., PRICE and LIMBAUGH, JJ., concur.

WHITE, J., dissents in separate opinion filed.

ROBERTSON and COVINGTON, JJ., concur in opinion of WHITE.

WHITE, Judge, dissenting.

I respectfully dissent. Michelle Winter suffered a violent and senseless death. The tragic circumstances of her death, however, do not relieve the State of its burden of proving that it was the defendant that caused her death beyond a reasonable doubt. As the principal opinion states, this Court is not to act as a "super juror" and veto the jury's verdict based on a reweighing of the evidence.[1] To affirm a conviction, however, this Court must do more than compose a scenario wherein the jury *could* find the defendant guilty. The fact that we are reviewing a conviction demonstrates that such a scenario exists. For a review of the sufficiency of the evidence to have a purpose beyond rubber-stamping convictions, this Court must do more than merely pay lip service to the standard of "beyond a reasonable doubt."

A reasonable juror must be able to infer from the State's evidence that Timothy Chaney knowingly caused Michelle Winter's death after deliberation on the matter.[2]

> An *'inference'* is a conclusion drawn by reason from facts established by proof; 'a deduction or conclusion from facts or propositions known to be true.' ... A *supposition* is a conjecture based on the possibility that a thing could have happened. It is an idea or a notion founded on the probability that a thing may have occurred, but without proof that it did occur.[3]

The strength of the inferences must be such that a reasonable juror could be convinced of guilt beyond a reasonable doubt. Proof beyond a reasonable doubt is "proof that leaves you firmly convinced of the defendant's guilt."[4]

The State presented evidence that Michelle and Stephanie spent time together at the Chaney house on the afternoon of April 8, 1995. Timothy Chaney left the house in his van between 4:30 and 5:00 p.m. Michelle left on foot at 4:50 p.m. Neighbors saw Michelle walking in the direction of her house at 5:00 p.m. Michelle's mother called Stephanie around 6:00 p.m., inquiring after Michelle. Timothy Chaney consistently stated that Michelle had not been in his van in the past year. He gave varying accounts of his whereabouts between 5:00 and 9:00 p.m. on the evening in question. When Michelle's body was found, the combination of particles clinging to her clothes matched materials found in the back of Timothy Chaney's van. From this evidence, a reasonable juror could infer that Michelle was in Timothy Chaney's van at some point on April 8, 1995, and that he had the *opportunity* to kill her.

The scenario proposed by the principal opinion consists of conjecture, stacking overlapping probabilities until it can link Timothy Chaney with the hand that inflicted the fatal stab wounds. The principal opinion even stacks suppositions on the absence of evidence, concluding, from the absence of testimony that anyone in the neighborhood heard Michelle scream or any other unusual noises, that Michelle disappeared into a vehicle, and disappeared into a vehicle of someone that *she knew*. While this is a possible explanation, it is not a logical inference of fact.

On top of the inference of opportunity and the speculation that Michelle entered a vehicle of someone that she knew, the principal opinion adds the facts that Chaney had on occasion gone camping and fishing in the Cape Fair area and that he had owned a business in a nearby community. The principal opinion concludes that these facts "connected Chaney to the murder."[5] Again,

---

1. Op. at 53.

2. MAI–CR 3d 302.01.

3. *Draper v. Louisville & N.R. Co.,* 348 Mo. 886, 156 S.W.2d 626, 630 (1941) (emphasis added, citations omitted). *See State v. Foster,* 930 S.W.2d 62 (Mo.App.1996). *See also State v. Grim,* 854 S.W.2d 403, 420 (Mo. banc 1993) (Robertson, J., dissenting).

4. MAI–CR 302.04.

5. Op. at 54.

such a conclusion is based on conjecture, not logical inference.

Once these suppositions are discarded, adding "consciousness of guilt" evidence[6] to the inference that Timothy Chaney had the opportunity to kill Michelle proves that he was conscious that he had a weak alibi. While it pains me to advocate reversing the conviction of a defendant who might be a murderer,[7] "might be" is not the applicable standard of review.

On the other hand, I am fully aware that the outcome of this appeal does not hinge on whether or not I would have reached a different verdict had I sat in the jury box. The standard is whether a reasonable juror following the trial court's instructions could be firmly convinced, based only on the State's evidence and logical inferences therefrom, without filling any gaps with gut instinct, that Timothy Chaney committed first-degree murder. After careful analysis of all the evidence, disregarding all inferences contrary to the State's case, it is clear that the State's case against Chaney is missing an essential element. No evidence ties him to the crime either directly or by first generation inference.

The principal opinion insists that a reversal in this case would create a burden on the State to affirmatively "disprove every reasonable hypothesis except that of guilt."[8] I disagree. A reversal of Timothy Chaney's conviction would not change the law that the State may secure a conviction on circumstantial evidence that is subject to conflicting inferences. It is the principal opinion that creates new law—*lessening* the State's burden—by extending this Court's review of the evidence in the light most favorable to the verdict to include the discretion to resolve any conceivable *supposition* in the State's favor. I understand this is the only way to rescue the State and affirm Timothy Chaney's conviction, but I am not prepared to take this step at the expense of future defendants. A reversal in this case is the only way to *enforce* the existing burden on the State, as imposed by the guarantees of due process, to prove each element of a crime beyond a reasonable doubt.[9]

I would reverse Timothy Chaney's conviction for insufficient evidence. Therefore, I do not concur with the principal opinion with regard to the conviction or the sentence.

---

6. *Id.* at 54–55.

7. When a conviction is overturned on the grounds that the evidence at trial was insufficient to support a finding of guilt, the double jeopardy clause prohibits the defendant from being retried for the same crime. U.S. CONST. amend. V (as made applicable to proceedings in state courts through the Fourteenth Amendment by *Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969). *State v. O'Brien,* 857 S.W.2d 212, 221 (Mo. banc 1993)); *See Hudson v. Louisiana,* 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981); *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978).

8. Op. at 55.

9. *See In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1072–73, 25 L.Ed.2d 368 (1970).