STATE of Missouri, Respondent,

v.

Jamel R. DIZER, Appellant.

No. ED 82376.

Missouri Court of Appeals,
Eastern District,
Division Two.

Oct. 7, 2003.

John M. Morris, Anne Edgington (co-counsel), Jefferson City, MO, for respondent.

Henry B. Robertson, St. Louis, MO, for appellant.

## OPINION

GLENN A. NORTON, Presiding Judge.

Jamel Dizer appeals the judgment entered upon his convictions on two counts of forcible sodomy and one count of false imprisonment. We affirm.

## I. BACKGROUND

Dizer, thirty-seven, met A.C., sixteen, outside a convenience store in January of 2001. A.C. was in a fight with several other people when Dizer appeared and told the others to leave the boy alone. Dizer pulled out what seemed to be a gun, which caused the others to flee. Dizer went with him to A.C.'s friend's house where A.C. and his mother had been staying. When they arrived, A.C. and his mother were told they could not stay there any longer, and Dizer offered to let them stay at his house. Dizer, A.C. and his mother then went to Dizer's friend's home where they played cards; Dizer and A.C. smoked marijuana outside of the house. At about 2:00 a.m., they left and went to Dizer's home. A.C. and his mother slept in the basement, and Dizer went upstairs. In the morning, A.C.'s mother left the house, and A.C. continued to sleep on a mattress on the basement floor. He awoke to find Dizer lying next to him on the mattress. When A.C. started to get up, Dizer told him he wanted to have sex with him. A.C. told Dizer "it wasn't going to happen," and Dizer started to choke him saying he would get it one way or the other. Dizer turned A.C. over onto his stomach, held him down flat on the mattress and sodomized him. After Dizer ejaculated, he wiped himself and A.C. off and went upstairs. A.C. blacked out; when he awoke, he could not find a way out of the basement. Ultimately, Dizer let him go. Dizer made A.C. promise not to tell anybody what happened.

A.C. went back to the convenience store, found his mother and told her what happened. The police were called, and, while A.C. was explaining to the police what had happened, a young woman at the store mentioned that her brother, D.E., had been sodomized by Dizer also.

In the fall of 1994, when he was fifteen, D.E met Dizer while hanging out with some friends at a park. He ran into Dizer a few other times in the neighborhood. Late one night, he found Dizer in the alleyway behind his house. Dizer asked D.E. if he wanted to make money. D.E. thought he meant selling drugs, which was not an unexpected question in his neighborhood, and told Dizer no. Dizer said he would not ask again. The next time D.E. saw Dizer was when he and his friends went to Dizer's house one night. D.E. had not been to Dizer's home before. Dizer had started living there, with other relatives, after getting out of prison in May of 1994. Everyone was on the second floor watching television and playing cards; some people were drinking alcohol and smoking marijuana, but D.E. had only half of a beer. At around midnight, everyone else left; D.E. stayed to avoid violating curfew. Dizer told D.E. that he wanted to have sex with him, and D.E. told him no.

When D.E. tried to go for the door, Dizer got in front of him and told him that even if he made it past him, he would shoot D.E. in the back of the head. Dizer then pinned D.E. to the ground and put his fingers around D.E.'s throat. Dizer told D.E. what he was going to do to him and threatened to kill him and his parents if he told anybody. Dizer then dragged D.E. into a bedroom, and with D.E. face-down on the bed, Dizer sodomized him. Afterwards, Dizer told D.E. that no one would believe him if he told anyone about this and that Dizer would deny it if asked. D.E. slept at Dizer's and left the next morning. D.E. did not tell anyone about the incident right away because he believed Dizer—that no one would believe him and that Dizer would come find him. He was scared and felt uncomfortable talking to somebody else about it.

A couple of days after the incident involving A.C., both victims identified Dizer during separate viewings of a live lineup at the police station. A.C. had also previously identified Dizer at the hospital the day of the incident from a stack of photographs the police gave him. Both victims also identified Dizer during trial.

At trial, Dizer testified that A.C. had approached him at the convenience store and that they had then spent that day and evening hanging out at various places in the neighborhood smoking marijuana with A.C.'s friend and A.C.'s mother. He claimed that A.C. and his mother asked if they could go back to Dizer's house with him, where "things started getting freaky." A.C. and his mother engaged in sexual behavior with each other, while A.C.'s mother initiated sex with Dizer.[1] He explained that he had just been released from another stint in prison[2] and was interested in having sex. He testified that he had sex with A.C.'s mother, and then she rubbed his ejaculate everywhere, which he claimed explained why semen with his DNA was found on A.C. He denied having sex with A.C. Dizer denied that he even knew D.E., claiming he had never seen him before the day of trial.

## II. DISCUSSION

### A. Joinder and Severance

These two incidents were charged in one information. Four counts related to A.C.: forcible sodomy or, in the alternative, statutory sodomy in the second degree, felonious restraint and assault in the third degree. Dizer was acquitted of the assault charge. Three counts related to D.E.: forcible sodomy or, in the alternative, deviate sexual assault and felonious restraint. The felonious restraint count ultimately was not submitted to the jury. Dizer moved to sever the counts relating to A.C. from those involving D.E. as improperly joined. The motion was denied, and the counts were tried together.

 Rule 23.05 provides that the State may charge, in the same indictment or information, all offenses "of the same or similar character."[3] We review the trial

1. Dizer claimed that, at the time, he thought this woman was A.C.'s friend and still did not believe she was his mother. He was impeached on this point, however, because he also testified that he had referred to her on the day of the incident as A.C.'s mother. Dizer maintained that, even if she was his mother, their "freaky" behavior was typical of Caucasians.

2. The record reveals that Dizer had been convicted in 1996 and sentenced to five years. By his testimony, he was released from prison in November of 2000. Thus, it appears he was in prison for most of the six-year lapse between the two incidents.

3. The Rule also permits joinder of offenses that are part of the same or connected transactions or that constitute a common scheme

court's refusal to sever joined offenses in two steps. *State v. Davis*, 860 S.W.2d 369, 372 (Mo.App. E.D.1993). First, we determine, based· on the State's evidence only, whether the offenses were properly joined as a matter of law. *Id.; State v. Morrow*, 968 S.W.2d 100, 109 (Mo. banc 1998). If not, then prejudice is presumed and we must reverse and order new separate trials of the offenses. *Morrow*, 968 S.W.2d at 109. If joinder was proper, however, then we consider whether the trial court abused its discretion in refusing to sever. *Davis*, 860 S.W.2d at 372.

### 1. Joinder

■■■ Liberal joinder is favored to achieve judicial economy. *Id.* Joinder is proper if the manner in which the crimes were committed is so similar that it is likely the same person committed all charged offenses. *Id.* Similar tactics are sufficient to constitute acts "of the same or similar character," but identical tactics are not required. *State v. Tobias*, 873 S.W.2d 650, 653 (Mo.App. E.D.1994). Rather, joinder is permissible if the tactics "resemble or correspond in nature." *State v. Vinson*, 834 S.W.2d 824, 827 (Mo.App. E.D.1992). Similar tactics include, but are not limited to, commission of the same type of offenses, against victims of the same sex and age group, occurring at the same location and closely related in time. *State v. Hyman*, 37 S.W.3d 384, 393 (Mo. App. W.D.2001).

In this case, the tactics Dizer used were similar. The offenses are virtually identical, involving forced and other illegal sex acts and restraint. The victims were both teenage males from the neighborhood whom Dizer befriended. Both of the crimes were committed at Dizer's home after having spent time socializing with the victim and others. In each instance, Dizer

initially told the victims that he wanted to have sex with them and, when they refused, he choked them and used threats to subdue them or prevent them from leaving. He had each victim lie on their stomachs while he sodomized them from that position. After each incident, Dizer attempted to ensure that the victims would not tell anyone.

Admittedly, the tactics were not identical: Dizer had known D.E. longer; D.E. and A.C. had different reasons for ending up at Dizer's home; the threats he made to D.E. were more specific; and the incidents took place in different parts of the house, at different times of day, over six years apart. In our view, however, the strength of the similarities of these crimes overcomes the differences in the details.

■■■ Dizer argues that the six-year lapse between the two incidents defeats joinder because it vitiates the likelihood that the same person committed the crimes. We disagree. A lapse in time between offenses, without more, does not automatically defeat joinder; especially here, where the other circumstances of the crimes so strongly suggest that the same person committed them both. *See State v. Kelley*, 953 S.W.2d 73, 79–80 (Mo.App. S.D.1997).

Dizer also contends that there is nothing distinctive about forcible sodomy, citing to *State v. Kelly*, 956 S.W.2d 922 (Mo.App. W.D.1997). In *Kelly*, the Western District held that there was nothing distinctive about the tactics used in the four incidents charged together other than that they all involved armed robberies by two men. *Id.* at 926. One incident in *Kelly* involved stealing a wallet at gunpoint on the street, another involved robbing from and riding around in a car with a group of people who asked for directions, another involved rob-

or plan, which the offenses in this case are not.

bery of a convenience store in a mask and another involved shoplifting that turned into a robbery when security got involved. *Id.* "If these were sufficiently similar, then so would be any armed robbery committed by two people." *Id.* This danger of condoning arbitrary joinder is not present here. As discussed above, the victims were similar, the tactics were similar and the location was the same. These circumstances not only make these forcible sodomy cases sufficiently similar to each other, but also distinct from other forcible sodomy cases.

Joinder was proper.

### 2. Severance

■ Severance of two properly joined offenses is appropriate "only if the defendant shows that he will suffer substantial prejudice if the offenses are not tried separately and the court finds the existence of bias or discrimination requiring separate trials of the offenses." *Morrow*, 968 S.W.2d at 109. The decision to sever is left to the sound discretion of the trial court. *Id.* To determine if the trial court abused that discretion, we consider the number of offenses joined, the complexity of the evidence and the likelihood that the jury could distinguish the evidence and apply it, without confusion, to each offense. *State v. Spencer*, 50 S.W.3d 869, 879 (Mo.App. E.D.2001).

The offenses in this case were not numerous or overly complex. The six counts submitted to the jury arose from just two separate incidents, and the victims' and officer's testimony bearing out the facts of those incidents was uncomplicated. Each offense was set out in a separate instruction, and the jury was specifically instructed that "[e]ach count must be considered separately." Nothing in the record indicates that the jury was unable to distinguish what evidence was relevant to each victim and each count.

■ Dizer contends that evidence that he abused one of these victims would not have been admissible in a separate trial of the charges relating to the other. We may consider whether evidence of the other crime would have been inadmissible propensity evidence when determining whether refusing to sever was prejudicial. *State v. Conley*, 873 S.W.2d 233, 238 (Mo. banc 1994). But even if Dizer were correct, "any prejudice may be overcome where the evidence with regard to each crime is sufficiently simple and distinct to mitigate the risks of joinder." *Id.* Here, the evidence relating to each crime was simple and distinct.

It was not an abuse of discretion for the trial court to deny severance in this case.

Point I is denied.

### B. Suppression of Lineup Identification

■ Before trial, Dizer moved to suppress the victims' identification of him at the live lineup. At the motion hearing, the officer who conducted the lineup testified that when she asked Dizer if he would participate in the lineup, she told him he had the right to have an attorney present. She testified that Dizer did not say anything about an attorney and agreed to be in the lineup. The officer described Dizer's behavior during the lineup as "fine": he did not raise or swing his arms around, say "hey, it's me," or otherwise try to disturb the lineup. Dizer testified at the motion hearing that when he was called to approach the glass and turn around during the lineup, he was upset and disappointed because he believed he had the right to an attorney and had been denied his request for one. He felt his rights were being violated, so he threw his hands up on the glass "indicating my rights was being on

the side, you know (Indicating) it's me." The motion was denied.

■■■■■■ Identification testimony is admissible unless the pretrial identification procedure was unnecessarily suggestive and the suggestive procedure made the identification unreliable. *State v. Middleton,* 995 S.W.2d 443, 453 (Mo. banc 1999). We will not disturb the trial court's decision to admit or exclude evidence unless there has been an abuse of discretion. *State v. Chaney,* 967 S.W.2d 47, 55 (Mo. banc 1998). We defer to the trial court's superior opportunity to judge the credibility of the witnesses at the motion hearing. *State v. Williamson,* 836 S.W.2d 490, 496 (Mo.App. E.D.1992). The facts are viewed in the light most favorable to the trial court's ruling and any contrary evidence and inferences therefrom are disregarded. *State v. Winston,* 959 S.W.2d 874, 878 (Mo. App. E.D.1997).

The trial court was free to disbelieve Dizer's claim that he had behaved suggestively in the lineup. Disregarding that testimony, there is nothing to show that the pretrial identification procedure was unnecessarily suggestive.

Even if Dizer's account is true, he admits that there is nothing in the record to show who was viewing the lineup at the time of his suggestive behavior. Thus, whether inadvertent or intentional, Dizer cannot demonstrate which victim's identification is rendered unreliable by the unduly suggestive lineup procedures. "The linchpin of due process in identification procedures is reliability, not suggestiveness." *State v. Weaver,* 912 S.W.2d 499, 520 (Mo. banc 1995). For that matter, even if Dizer's suggestive behavior were inadvertent and occurred during both victims' viewing, the totality of the circumstances demonstrates that both victims' identifications were still reliable. Both had clear and lengthy opportunities to view Dizer before,

during and immediately after the crimes; there is nothing to suggest that either of them were inattentive during the commission of these crimes or that either of them were at all uncertain about any of their identifications, including at trial; A.C.'s lineup identification was made just two days after the crime; and A.C. had also previously accurately identified Dizer on the day of the crime. *See Williamson,* 836 S.W.2d at 496 (reciting factors for determining reliability). A.C.'s identification is clearly reliable. The only factor weighing against the reliability of D.E.'s identification is that it occurred several years after the crime. This alone is not sufficient to demonstrate unreliability, however, in light of the other factors.

The trial court did not abuse its discretion in admitting these identifications.

Point IV is denied.

## C. Hearsay and Improper Bolstering

At trial, the State asked the investigating officer whether, during her interview with D.E. on the day of the lineup, he indicated why he had not come forward with the allegation of forcible sodomy right after it happened. The officer testified, over Dizer's objection, that D.E. told her he was embarrassed and concerned because Dizer had threatened to kill him if he talked to anyone about it. D.E. testified later and gave substantially the same explanation for his delay: he did not think anyone would believe him, he was scared Dizer would come after him and he was uncomfortable talking about it.

■■■■ Dizer argues that the officer's explanation was hearsay not within the subsequent conduct exception because it went beyond merely stating that a complaint had been made and was also improper bolstering of D.E.'s later consistent testimony. He contends that admission of this

testimony was reversible error because it probably influenced the jury to find D.E. more credible. We find that, even if the officer's testimony was hearsay and improper bolstering, any error in admitting it was harmless.

We will not disturb the trial court's decision to admit or exclude evidence unless there has been an abuse of discretion. *Chaney,* 967 S.W.2d at 55. An abuse of discretion in admitting challenged evidence is reversible error only if the admission so prejudiced the defendant that it deprived him of a fair trial. *State v. McMillin,* 783 S.W.2d 82, 98 (Mo. banc 1990); *see also State v. McClendon,* 895 S.W.2d 249, 252 (Mo.App. E.D.1995). The defendant must show a reasonable probability that without the admission of the evidence the verdict would have been different. *State v. Moore,* 88 S.W.3d 31, 36 (Mo.App. E.D.2002). The improper admission of a testifying witness's duplicative and corroborative out-of-court statement is harmless if it adds nothing substantial and the witness is available for cross-examination. *McMillin,* 783 S.W.2d at 98; *see also State v. Barbee,* 822 S.W.2d 522, 526–27 (Mo.App. E.D.1991).

Here, D.E.'s prior statement to the officer explaining his delay in bringing this allegation was virtually identical to part of his trial testimony, to which Dizer did not object and about which D.E. was cross-examined. *See State v. Hutton,* 825 S.W.2d 883, 887 (Mo.App. E.D.1992) (cross-examination may obviate hearsay dangers of unreliability inherent in prior consistent statements). More importantly, the officer's testimony concerning D.E.'s explanation was brief and added nothing of substance to D.E.'s testimony. In fact, the officer's testimony did not replicate any part of D.E.'s description of the actual incident. Finally, D.E.'s testimony was not totally duplicated by the officer, unlike

cases where admission of a testifying victim's prior consistent statement was prejudicial because it basically allowed the victim to testify twice. *See, e.g., State v. Seever,* 733 S.W.2d 438, 441 (Mo. banc 1987).

Dizer has not demonstrated a reasonable probability that without the admission of the officer's testimony, the verdict would have been different. His claim that because this one part of D.E.'s testimony was corroborated, the jury was influenced to believe all of D.E.'s testimony and none of Dizer's is unfounded. Both D.E. and Dizer were impeached on various issues. There were other reasons for the jury to disbelieve Dizer and find D.E. more credible. Even if the jury did not believe D.E.'s explanation for why he waited to report the crime, it is not reasonably probable that would have changed the verdict.

Admission of this testimony did not prejudice Dizer to the point that he was deprived of a fair trial and, thus, was harmless.

Point II is denied.

## D. Adverse Inference

Dizer's counsel was denied his request to argue, during closing statement, an adverse inference from the State's failure to call A.C.'s mother as a witness. A trial court has considerable discretion in limiting closing arguments, and its rulings are reviewed only for an abuse of discretion. *State v. Wallace,* 43 S.W.3d 398, 403 (Mo.App. E.D.2001). Specifically, the trial court has broad discretion in determining whether the facts warrant allowing a party to argue an unfavorable inference from the failure to produce a witness. *See State v. Chunn,* 784 S.W.2d 228, 230 (Mo.App. E.D. 1989).

A party may not argue an adverse inference from the failure to call a witness who is equally available to both

parties or unavailable to both parties. *Wallace,* 43 S.W.3d at 404. To determine if a witness is equally available, the court considers: (1) whether one party has a superior ability to know or identify the witness; (2) the nature of the testimony the witness is expected to give; and (3) whether one party's relationship with the witness indicates a likelihood that the witness would testify more favorably for that party than for the other. *Id.* This test, however, "assumes that the witness has knowledge of facts and circumstances 'vital to the case.'" *State v. Hopkins,* 947 S.W.2d 826, 829 (Mo.App. W.D.1997) (quoting Kelly by Kelly v. Jackson, 798 S.W.2d 699, 702 (Mo. banc 1990)). Thus, an adverse inference may not be argued if the witness's testimony would be merely corroborative of, or cumulative to, other testimony. *State v. Lansford,* 594 S.W.2d 617, 622 (Mo.1980).

Here, A.C.'s mother was deposed before trial, and the parties seemed to agree that, based on her deposition, her testimony was expected to support her son's account of the events surrounding the incident and not in any way support Dizer's version. Therefore, her testimony would merely corroborate, or be cumulative to, A.C.'s testimony about those events and would be of minimal value as to the incident itself, since she did not witness it.

The trial court did not abuse its discretion in prohibiting comment on the State's failure to call A.C.'s mother.

Point III is denied.

## III. CONCLUSION

The judgment is affirmed.

KATHIANNE KNAUP CRANE, J. and MARY K. HOFF, J. concurring.