

# *In the*
# *Missouri Court of Appeals*
## *Western District*

| | | |
|---|---|---|
| **STATE OF MISSOURI,** | ) | |
| | ) | |
| **Respondent,** | ) | **WD87121** |
| | ) | |
| **V.** | ) | **OPINION FILED:** |
| | ) | **AUGUST 19, 2025** |
| **SEMAJ J. FOSTER,** | ) | |
| | ) | |
| **Appellant.** | ) | |

**Appeal from the Circuit Court of Grundy County, Missouri**
The Honorable Steven Daniel Hudson, Judge

Before Special Division:  Gary D. Witt, Presiding Judge, Thomas N. Chapman, Judge
and Zel M. Fischer, Special Judge

Semaj J. Foster appeals the judgment of the Circuit Court of Grundy County,

Missouri ("trial court"), convicting him, after a jury trial, of one count of drug trafficking

in the first degree for knowingly attempting to transport and distribute 51 grams of

methamphetamine, section 579.065;[1] one count of drug trafficking in the first degree for

knowingly attempting to transport and distribute 12 grams of crack cocaine, section

579.065; one count of resisting arrest, section 575.150; and one count of careless and

imprudent driving involving an accident, section 304.012.  On appeal, Foster alleges

---

[1] All statutory references are to the Revised Statutes of Missouri (2016), as updated by
the applicable supplement.

there was insufficient evidence to support his convictions for drug trafficking. We affirm the judgment of the trial court in part and reverse in part.

## Factual and Procedural Background

On June 3, 2023, Foster was driving a vehicle owned by his mother ("Mother"),[2] who was a passenger in the vehicle. Noticing that the vehicle did not have a front license plate, a Missouri State Trooper ("Trooper") who was on patrol stopped the vehicle. After Trooper received Foster's and Mother's identification, he asked Foster to exit his vehicle, but Foster instead drove away. Trooper followed Foster for approximately two miles as Foster drove at speeds up to 120 miles per hour. Foster took an exit and attempted to get right back onto the interstate, but he lost control of his vehicle and crashed into an embankment, totaling the vehicle. Foster ran from the scene on foot. Trooper started to pursue Foster on foot, but noticed that Mother was trapped inside the vehicle and was bleeding from her face, so he decided to get Mother out of the car and administer first aid instead. Trooper went back to his car to get his medical kit and to use his radio to call for backup to apprehend Foster.

When Trooper returned to the wreckage, he saw that Mother had gone into the back seat of the vehicle and was "possibly tampering with evidence or hiding evidence or grabbing a gun." He advised Mother to get out of the vehicle and show him her hands. At about this time another trooper had apprehended Foster and returned him to the scene of the crash.

---

[2] Pursuant to Missouri Supreme Court Operating Rule 2.02(c)(3), we do not include names of witnesses or other individuals who are not parties.

Trooper searched the vehicle and found three bags in the rear of the vehicle. Trooper believed there were various controlled substances in the bags. Trooper testified that he believed the substances were amphetamine, methamphetamine, crack cocaine, marijuana, weigh scales, baggies, pre-rolled marijuana joints, and a green liquid he believed to be methadone. A firearm and two loaded magazines were also found at the scene. Initially, Trooper believed some rainbow-colored powder and rainbow-colored pills were fentanyl based on his experience and training, but Trooper changed his mind and decided the multicolored substance was methamphetamine after Mother informed Trooper that Foster "was going through a meth problem." He believed another substance was crack cocaine based on its appearance, which was "almost like chunky soap but also like powder at the same time."[3] Trooper weighed the substances he seized, and the suspected fentanyl or methamphetamine weighed 51 grams; the suspected crack cocaine weighed 12 grams.

The State intentionally did not call an expert from the Highway Patrol laboratory to testify at trial. The State argued to the trial court that the laboratory report, without the testimony of an expert, was admissible through the testimony of the Trooper because under the "federal rules of evidence . . . [p]eople can only testify to documents they have

---

[3] The substances recovered at the scene were transported to the Highway Patrol lab for drug analysis, but the State did not produce any admissible evidence of the results of that analysis. Trooper could not testify regarding the lab testing because the chemical testing process was not within his expertise. *See State v. Watt*, 884 S.W.2d 413, 415 (Mo. App. E.D. 1994) (criminologist could not testify about chemical tests conducted by a former employee who did not herself testify). The lab report was, therefore, hearsay, and there was no foundation for the test results. The trial court correctly sustained Foster's objection to the admission of the lab report.

personal knowledge of and [Trooper] has personal knowledge of the [lab report].  He's authenticated it, he said it's a genuine and accurate copy of what he's already reviewed."  The State further argued that the results of the testing were not "scientific" so no expert was needed so long as the State did not go into the methods used by the laboratory technician in performing the analysis.  The argument was essentially that, because the Trooper has personal knowledge that the substances he seized did test positive for the substances he suspected they were, he could testify to what the test results showed.  "We got a certified record from the Highway Patrol.  Something that is completely routine.  [Trooper] works for the Highway Patrol.  This is something they do all of the time and this is something of which [Trooper] has personal knowledge."

Trooper testified that he had significant training on "narcotic related incidents," including a recent two-day canine and narcotics training, and he had attended "over 200 hours of narcotic classes."  Trooper was allowed to testify, over objection, as to what he believed the substances to be, and his opinions were based on the appearance of the substances and Mother's comment.

The jury found Foster guilty of all four counts, and the court sentenced Foster to concurrent sentences of thirteen years in the Department of Corrections on each of the trafficking counts, four years for resisting arrest, and one year in the county jail for careless driving.  This appeal follows.

4

**Standard of Review**

"When reviewing the sufficiency of evidence supporting a criminal conviction, the Court does not act as a 'super juror' with veto powers, but gives great deference to the trier of fact." *State v. Chaney*, 967 S.W.2d 47, 52 (Mo. banc 1998). We examine whether sufficient evidence was presented at trial to permit a reasonable fact finder to find the defendant guilty beyond a reasonable doubt. *State v. Berwaldt*, 652 S.W.3d 793, 796 (Mo. App. W.D. 2022). We accept as true all evidence favorable to the verdict, including all favorable inferences properly drawn therefrom, and we disregard all evidence and inferences to the contrary. *Id.* "The inquiry does not require a court to ask itself whether it believes that the evidence at trial established guilt beyond a reasonable doubt." *State v. Woods*, 284 S.W.3d 630, 639 (Mo. App. W.D. 2009) (internal quotation omitted). Instead, the relevant question is whether "any rational fact-finder could have found the essential elements of the crime beyond a reasonable doubt." *Berwaldt*, 652 S.W.3d at 796 (internal quotation omitted).

**Sufficiency of the Evidence**

Foster raises two points on appeal that make essentially the same argument as to the two counts of drug trafficking, and we will discuss the two points together. Foster contends that there was insufficient evidence to prove beyond a reasonable doubt that the substances Trooper collected from the vehicle were, in fact, methamphetamine and crack cocaine, respectively. A charge of trafficking drugs pursuant to section 579.065 requires proof that the defendant distributed, delivered, manufactured, produced or attempted to distribute, deliver, manufacture or produce certain threshold amounts of specific

5

controlled substances. *State v. Massey*, 60 S.W.3d 625 (Mo. App. W.D. 2001). Pursuant to the statute, the threshold amounts vary depending on the specific controlled substance.

"Proof that a substance is contraband drug does not always require expert testimony, but the proof must be sufficient to support a finding by the trier of fact that *the substance was the charged contraband* beyond a reasonable doubt." *State v. Eyman*, 828 S.W.2d 883, 886 (Mo. App. W.D. 1992) (emphasis added, internal citation omitted). Where the alleged contraband was marijuana plants, an officer having considerable experience in investigating marijuana cases could testify that, in his opinion, the substance was marijuana. *State v. Roper*, 591 S.W.2d 58, 61 (Mo. App. E.D. 1979). However, in *Roper*, the Court noted that marijuana, unlike other substances, was not "an extract or preparation difficult or impossible to characterize without chemical analysis, but consisting of the dried leaves, stems, and seeds of a plant which anyone reasonably familiar therewith should be able to identify." *Id.* (quoting *State v. Maupin*, 330 N.E.2d 708, 713 (Ohio 1975)). This analysis is unique and limited to marijuana in its natural state.

Proof of the identity of a substance as a contraband drug may also, in very limited circumstances, be established by having someone who used or sold the substance testify as to its identity. In *State v. Krutz*, a conviction for cocaine possession was affirmed where there had been no chemical analysis, but two "user-experts" who had ingested the exact substance that was the subject of the offense and testified that the substance was cocaine. *State v. Krutz*, 826 S.W.2d 7, 8 (Mo. App. W.D. 1991). In *Krutz*, this Court

6

stated that the nature of an illegal substance could be proven with circumstantial evidence, and found that

> [s]uch circumstantial proof may include evidence of the physical appearance of the substance involved in the transaction, evidence that the substance produced the expected effects when sampled by someone familiar with the illicit drug, evidence that the substance was used in the same manner as the illicit drug, testimony that a high price was paid in cash for the substance, evidence that transactions involving the substance were carried on with secrecy or deviousness, and evidence that the substance was called by the name of the illegal narcotic by the defendant or others in his presence.

*Id.* (quotation omitted). *See also State v. Neal*, 624 S.W.2d 182, 182 (Mo. App. S.D. 1981) (buyer of substance testified that he bought ten pounds of the marijuana from the defendant, knew what marijuana looked like, had smoked "10-12 joints" per day over the last two years, and had smoked three "cigarettes" from the marijuana defendant sold him).

However, an officer's testimony about the appearance of a substance other than marijuana has been found insufficient to establish that the substance was a particular contraband drug. In *State v. Keel*, the defendant was charged with possessing drug paraphernalia for having scales that the State charged she had intended to use to weigh drugs. *State v. Keel*, 565 S.W.3d 755, 756 (Mo. App. W.D. 2019). The only proof that the defendant intended to use the scale to weigh drugs was the presence of "a crystal-like residue" that the officer observed and "field test[ed]" to be methamphetamine. *Id.* at 758. This testimony was found to be insufficient. Keel's challenge to the sufficiency of the evidence was granted and the conviction was reversed even though in that matter a field test was completed indicating the substance to be methamphetamine. *Id*. at 759.

7

In the present case, the only admissible evidence that the substances collected were methamphetamine and crack cocaine, respectively, was the testimony of Trooper. The State concedes that at trial they did not put the lab report into evidence or the results of any drug testing and "did not rely on such a test to prove the nature of the pills and powder." Trooper testified that one substance resembled rainbow- or multi-colored powder and pills, while the other had the appearance of "chunky soap, but also like a powder." Trooper did not testify that he had ever personally observed any methamphetamine made up of multi-colored powder or pills himself, but only testified that "recent training that we've been through and they've been pushing out a rainbow-colored powder which has been linked to *fentanyl* during the majority of the testing that other agencies have done." Trooper did not testify that he had ever even *heard* of multi-colored powder or pills containing methamphetamine. In fact, he testified he changed his opinion that the pills contained methamphetamine instead of fentanyl because Mother told him that Foster had a "meth problem." The State's argument regarding the admissibility of the laboratory report without having first called an expert is telling, "As a matter of fact, we discussed very early on in the case when the lab test came back negative for fentanyl. We were amending the information to show what the drug actually was, which was methamphetamine." The State relied on the Trooper's belief that the substance was fentanyl in making its original charging decision. After the laboratory report was completed, the State amended the charge to methamphetamine because the Trooper's belief as to the nature of the substance was inaccurate. Similarly, the original charges included a charge that methadone was found in Foster's automobile, but the

8

laboratory analysis of the substance the Trooper believed to be methadone came back negative for that substance.

As for the alleged crack cocaine, Trooper described the substance, but he did not expressly testify that it appeared to resemble any crack cocaine he had previously personally observed. Unlike other cases, there was no testimony from any other person who had sold, bought, or used the substances, under what circumstances, or that the substance had the character of the drugs they were alleged to be other than surface appearance. The State's evidence that the substance was crack cocaine was based solely on the Trooper's visual examination. Trooper's experience with the substances in this case was insufficient for a reasonable person to conclude based on his testimony that the substances were, beyond a reasonable doubt, methamphetamine and crack cocaine. *See Eyman*, 828 S.W.2d at 887. The State failed to introduce sufficient evidence that the items were in fact the controlled substances Foster was charged with trafficking.[4] *See Keel*, 565 S.W.3d at 758–59.

"The State bears the burden to prove each and every element of a charged offense beyond a reasonable doubt." *State v. Perrey*, 711 S.W.3d 483, 488 (Mo. App. E.D. 2025). The evidence in this case is insufficient to establish, beyond a reasonable doubt, that the substances seized from Foster were methamphetamine and crack cocaine without the evidence of a laboratory analysis.

---

[4] It is worth reiterating that Foster was charged with trafficking and not mere possession of the substances, and therefore the State was required to prove that the substances found in Foster's possession were both the substances alleged and were present in the threshold quantities.

9

Foster's Points I and II are granted.

## Conclusion

For the above-stated reasons, we reverse the judgment of the trial court as to Counts I and II, and affirm the judgment as to the remaining counts.

_____
Gary D. Witt, Presiding Judge

All concur